RESPECTFULLY SUBMITTED at Fort Lauderdale, Florida this 13th day of March, 2015.

**RICHARD THORPE & DARREL WEISHEIT, Individually and on Behalf of all Others Similarly Situated,[1] Plaintiffs,**

v.

**WALTER INVESTMENT MANAGEMENT, CORP. et al., Defendants.**

**Case No. 1:14–cv–20880–UU.**

United States District Court, S.D. Florida.

Signed June 30, 2015.

---

1. On July 7, 2014, Plaintiff Steven Beck voluntarily dismissed his claims against the Defendants pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). D.E. 48. Therefore, the Clerk is directed to terminate Steven Beck as a party in this action.

Jeremy A. Lieberman, Murielle J. Steven, Star M. Tyner, Pomerantz, LLP, Laurence Matthew Rosen, Jonathan Stern, The Rosen Law Firm, P.A., New York, NY, Jayne Arnold Goldstein, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, Weston, FL, for Plaintiffs.

Andrew D.W. Cattell, David Elbaum, Heather L. Shaffer, Peter E. Kazanoff, Simpson, Thacher & Bartlett, LLP, New York, NY, Allison Beth Kernisky, Stephen Patrick Warren, Tracy Ann Nichols, Holland & Knight LLP, Miami, FL, Gianluca Morello, Wiand Guerra King P.L., Tampa, FL, for Defendants.

## OMNIBUS ORDER

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon Defendant H. Marc Helm's Motion to Dismiss the Second Amended Class Action Complaint, D.E. 76, and Defendants Walter Investment Management, Corporation, Mark J. O'Brien, Denmar Dixon, Keith A. Anderson, Brian Corey and Charles E. Cauthen's Motion to Dismiss the Second Amended Class Action Complaint, D.E. 77. On February 29, 2015, Plaintiffs Richard Thorpe and Darrel Weisheit filed their response, D.E. 79, and on February 19, 2015, the Defendants filed their reply, D.E. 80 & 81. Thus, the Motions are ripe for disposition.

THE COURT has considered the Motions and the pertinent portions of the record, and is otherwise fully advised in the premises. For the reasons stated below, Defendant H. Marc Helm's Motion to Dismiss is GRANTED and Defendants Walter Investment Management, Corporation, Mark J. O'Brien, Denmar Dixon, Keith A. Anderson, Brian Corey and Charles E. Cauthen's Motion to Dismiss is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND [2]

This is a federal securities fraud class action brought against Walter Investment Management, Corp. ("Walter Investment" or the "Company") and several officers and board members of Walter Investment and its wholly-owned subsidiaries Green Tree Servicing LLC [3] ("Green Tree") and Reverse Mortgage Solutions, Inc.[4] ("RMS"). Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5. Plaintiffs allege that Defendants made false or misleading statements or failed to disclose that: (1) the Company had lax and inadequate legal and regulatory compliance controls; (2) the Company's business practices repeatedly violated consumer protection laws and thereby, jeopardized the Company's revenues and profits; (3) the Company ignored repeated loan servicing errors in violation of applicable regulations; (4) the Company's internal controls over financial reporting and servicing processes and procedures were not effective; (5) RMS's financial statements were materially overstated and contained false and misleading statements; and (6) the Company overstated the value of the RMS

---

**2.** All references to "Compl." herein refer to the Second Amended Class Action Complaint filed on January 6, 2015 and located at D.E. 73. And all references to "D.E." refer to the docket entry number associated with the referenced document.

**3.** Green Tree is a servicer of home loans and specializes in servicing sub-prime residential mortgages. (Compl. ¶ 35.).

**4.** RMS originates and services reverse mortgage consumer loans. (Compl. ¶ 36.).

acquisition. (Compl. ¶ 19.) Lead Plaintiff Richard Thorpe and Plaintiff Darrel Weisheit bring these claims on behalf of a putative class of persons who purchased Walter Investment securities between May 9, 2012 and August 11, 2014, both dates inclusive (the "Class Period"). (Compl. ¶ 1.)

Walter Investment is a loan servicer and loan originator focused on generating recurring, fee-based revenues from an asset-light platform, which includes less-than-prime loans, non-conforming loans and other credit challenged mortgage assets. (Compl. ¶ 2.) The six individual defendants (collectively, the "Individual Defendants") either are or were senior officers of the Company or its wholly-owned subsidiaries, Green Tree or RMS, during the Class Period. The Individual Defendants are as follows: (1) Mark J. O'Brien, the Company's Chairman of the Board of Directors and Chief Executive Officer; (2) Denmar J. Dixon, the Company's Vice Chairman and Executive Vice President, member of the Company's Audit Committee and Nominating and Corporate Governance Committee, and Chairman of the Compensation and Human Resources Committee; (3) Charles E. Cauthen, former Chief Operating Officer and Chief Financial Officer for the Company; (4) Keith A. Anderson, the Company's Chief Operating Officer since August 2013 and Green Tree's Chief Executive Officer and President since September 2011; (5) Brian Corey, Senior Vice President and Chief Compliance Officer for the Company and Senior Vice President, General Counsel and Secretary for Green Tree during the Class Period; and (6) H. Marc Helm, Co–Founder, President, Chief Operating Officer and Chief Executive Officer of RMS until December 2013. (Compl. ¶¶ 27–32.)

### I. The Alleged Misrepresentations

The alleged misrepresentations fall into two categories: (i) those that concern the Company's financial statements, compliance with state and federal laws, internal controls over loan servicing protocols and procedures, and internal controls over loan operations; and (ii) those that concern the RMS acquisition and RMS's financial condition.

### A. Allegations Concerning the Company's Financial Statements, Compliance & Internal Controls

With respect to the Company's financial statements, compliance and internal controls, Plaintiffs allege that Defendants misrepresented and/or failed to disclose the following: (i) the Company had lax and inadequate legal and regulatory compliance controls; (ii) the Company was not in compliance with applicable legal and regulatory requirements; (iii) the Company's business practices repeatedly violated consumer protection laws thereby jeopardizing the Company's revenues and profits; (iv) the Company ignored repeated servicing errors in violation of applicable regulations; and (v) the Company had inadequate internal controls over financial reporting and loan servicing operations which led to the Company's issuance of materially false and misleading financial statements. (Compl. ¶¶ 76–78, 87, 100 & 112.) According to Plaintiffs, Defendants made the following misrepresentations about the Company's financial statements, compliance, and internal controls:

● On May 9, 2012, August 9, 2012 and May 10, 2013, the Company filed Form 10–Q with the SEC, which reported the Company's cash and cash equivalents as well as contained the dollar amounts of the Company's residential loan assets, loan receivables, revenue, expenses and net income. Form 10–Q also included signed certifications, pursuant to the Sarbanes–Oxley Act of 2002, by Defendants

O'Brien and Cauthen, stating that the financial information contained in Form 10–Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. (Compl. ¶¶ 79, 82 & 107.)

- On May 9, 2012, Walter Investment issued its First Quarter 2012 Earnings Presentation to investors, which touted its "servicer rating affirmed or upgraded" and "culture of compliance—strong independent controls and processes for monitoring and managing compliance." (Compl. ¶ 80.)

- On June 5, 2012, the Company issued its presentation at the Keefe, Bruyette & Woods Mortgage Finance Conference to investors, which touted the Company's "active portfolio management—to improve servicing, regulatory compliance and credit performance," "grounded in the long-term value proposition we offer clients for improved credit performance and regulatory compliance," and "proven track record as a high-quality manager of whole loans." (Compl. ¶ 81.)

- On August 9, 2012, Walter Investment issued its Second Quarter 2012 Earnings Presentation to investors, which touted the Company's "differentiated servicing model: platform continues to deliver results that exceed clients' expectations" and "culture of compliance: regulatory compliance capabilities remain at the 'top of the list' in terms of ability to win new business." (Compl. ¶ 83.)

- In an earnings call held on August 9, 2012, Defendant O'Brien stated: "We have a solid platform with distinct advantages that afford our shareholders a great vehicle for which to participate and a significant growth opportunity within the mortgage servicing sector. We continue to execute for our clients by delivering strong portfolio performance in a regulatory-compliant matter." (Compl. ¶ 84.)

- During the same earnings call, Defendant Cauthen stated, in relevant part: "[W]e're very comfortable and confident that our business practices meet all the requirements out there. You can go through the [Consumer Financial Protection Bureau's] examination manual or any of the other information you might read publicly about what best practices are in this business and we follow those very, very stridently." (Compl. ¶ 85.)

- On August 9, 2012, Walter Investment issued a press release which quoted Defendant O'Brien as stating: "We continue to exceed our clients' expectations for performance on serviced portfolios and are seeing operational improvements in our Loans & Residuals segment and our ARM business. Based on our continued track record of performance, as well as the significant amount of new business opportunity in the market and in our pipeline, we expect to see continued strong performance and results in the second half of this year." (Compl. ¶ 86.)

- On September 11, 2012, Defendants presented at the 2012 Investor and Financial Analyst Day and the presentation included remarks by Defendants O'Brien, Dixon, Corey and Anderson. (Compl. ¶ 95.)

 - During the presentation, Defendant Anderson made statements such as: (i) "[W]e put so much emphasis on our day-to-day activities of compliance;" (ii) "Things like charging fees to customers and handling customer complaints. We don't take any of those things lightly. We always want to be well inside the boundaries. We don't want to push any of the boundaries on any of those

activities;" and (iii) "So where there's opportunities to make another $0.05 or $0.10 and some fee opportunities and we don't see that it's well-defined within state regulatory requirements, we're going to pass on that. We're going to leave that money aside because we're more comfortable managing in a tighter box." (Compl. ¶ 95.)

- During the presentation, Defendant Corey made statements such as: "We hold regularly scheduled meetings with senior management at least monthly where we review law changes and go through implementation to make sure that we remain on track. Next, we prepare policies and procedures, forms and employee alerts, and all of those are reviewed by the compliance department before they're implemented. The organization conducts employee training, when appropriate, on law changes, and then we perform post-implementation audits and quality control." (Compl. ¶ 96.)

- The slide presentation used by Defendants at the 2012 Investor and Financial Analyst Day represented, among other things, that the Company had the following:

 - "Culture of Compliance: Strong independent controls and processes for monitoring and managing compliance."

 - "Green Tree has the necessary independent control and processes to mitigate risk. This is monitored through: Legal and Compliance Departments; Internal Audit; Quality Control; Call Monitoring; Policy and Procedures."

 - "These controls and functions exist to mitigate regulatory, litigation, reputational and financial risks."

 - "Compliance—Risk Mitigation: To preserve client brand value, we aggressively maintain compliance with all federal and state requirements and laws. Quarterly audits are conducted to ensure our standards are met."

 - "All third-party agents (e.g. collection agencies and attorneys) are required to complete a rigorous due diligence process."

 - "Third-party score cards are used to ensure consistent performance, quality, and compliance, and are maintained over time."

 - "Risk Mitigation: Leverages Green Tree's compliant and secure infrastructure, ensuring compliance risk is minimized; Customer Service and compliance-based collections approach to mitigate 'headline risk;' Collector and supervisor incentives ties to compliance requirements."

 - "GT ARM Customer–Centric Approach: Respect, Teamwork, Prudence, Responsiveness, Integrity, Fairness, Accountability, Dignity, Performance–Oriented."

 - "Green Tree's demonstrated capabilities, both in Credit Performance and Compliance with Industry Regulations, positions us well for future growth." (Compl. ¶¶ 97 & 98.)

- On November 8, 2012, Walter Investment issued its Third Quarter 2012 Earnings Presentation to investors, which touted the Company's "differentiated servicing model: high level of compliance drives preferred partner status." (Compl. ¶ 99.)

- In a March 19, 2013 fourth quarter earnings conference call, Defendant O'Brien stated, "[i]n the servicing business, we have added significant additional product capabilities and clearly added scale. We have

achieved this while maintaining high standards of performance and compliance across the entire platform." (Compl. ¶ 104.)

- In a March 26, 2013 2012 year-end earnings presentation to investors, Defendants represented that it "[r]educed CDR [Cohort Default Rates] through improved servicing performance" and its "2013 Base Performance and Earnings Drivers" included "Servicing performance; CDR Reduction; Highly efficient transfers." (Compl. ¶ 105.)

- In a May 9, 2013 first quarter 2013 earnings presentation and a June 12, 2013 Morgan Stanley Financials Conference, Defendants represented that the Company's "[h]igh level of compliance drives preferred partner status." (Compl. ¶¶ 106 & 108.)

- On August 8, 2013, the Company issued a press release announcing the Company's second quarter 2013 financial results, which quoted Defendant O'Brien as stating, "[o]ur core Servicing segment continued to deliver solid growth in profits and exceptional operational performance from both existing and recently acquired portfolios of new business." (Compl. ¶ 109.)

- On August 8, 2013, the Company issued its Second Quarter 2013 Earnings Presentation to investors, which touted the Company's servicing business by stating: (i) "high level of compliance drives preferred partner status;" (ii) "[r]eceived servicer rating upgrades from Fitch Ratings, making Green Tree top rated specialty servicer;" (iii) "[s]ervicing segment achieved exceptional results while boarding 552,000 accounts, lowering GSE first-lien delinquencies by 126 bps and growing incentive and performance based fees 83% as compared to the prior year period;" and (iv) "[s]ervicing: Delinquency improve-

ments driven by the business model improve profitability." (Compl. ¶ 110.)

- On September 24, 2013, in a presentation at the Barclays Global Financial Services Conference, Defendants represented that the Company "[r]eceived servicer rating upgrades from Fitch Ratings, reinforcing Green Tree's top rated specialty servicer status" and "[s]ervicing: Delinquency improvements driven by the business model improve profitability." (Compl. ¶ 111.)

*B. Allegations Concerning the RMS Acquisition and RMS Financial Condition*

With respect to the RMS acquisition and RMS's financial condition, Plaintiffs allege that Defendants misrepresented and/or failed to disclose that: (i) RMS's financial statements were overstated by material amounts and contained false and misleading statements, (ii) there were material weaknesses in the Company's internal controls, (iii) the Company overstated the value of the RMS acquisition, and (iv) RMS's financials understated the Company's servicing liabilities. (Compl. ¶¶ 94 & 103.) According to Plaintiffs, the Defendants made the following misrepresentations about the RMS acquisition and its financial condition:

- On August 6, 2012, the Defendants filed Form 8–K with the SEC, which explained the terms of the RMS acquisition. (Compl. ¶ 90.)

- In a September 4, 2012 presentation to investors, the Company stated that the RMS deal was "[i]mmediately accretive to Walter Investment stand-alone earnings." (Compl. ¶ 68.)

- On September 4, 2012, Walter investment announced its acquisition of RMS and stated that the RMS "pur-

chase price as multiple of 2012E EBITDA[5] is at an attractive level of 2.6X," RMS "string earnings and EBITDA generation," and "strong earnings accretion and a solid return on invested capital well in excess of our cost of capital." (Compl. ¶ 88.)

- On September 4, 2012, the Company issued a press release describing the RMS acquisition, which in relevant part stated: "The Company anticipates the acquisition of RMS will be significantly accretive to both earnings and cash flow, and estimates that, on a pro forma basis, the acquisition would have been accretive to 2012 core earnings per share by approximately 25% had the acquisition been completed at the beginning of this year. The $120.0 million transaction value represents a multiple of approximately 2.6x RMS's expected 2012 EBITDA, or 4.1x its 2012 expected core earnings." (Compl. ¶ 89.)

- On October 15, 2012, the Company filed a Form 8–K with the SEC and incorporated by reference RMS's financial statements for 2010 and 2011, as well as unaudited financial statements for the period ended June 30, 2012. (Compl. ¶ 91.)

- On November 7, 2012, the Company announced in a press release and in a Form 8–k that it had completed its acquisition of RMS for consideration of approximately $120 million. (Compl. ¶¶ 92 & 93.)

- On January 17, 2013, the Company filed an amended Form 8–K in order to report pro forma financial information relating to the RMS acquisition, which incorporated by reference the unaudited financial results for RMS as of September 30, 2012. (Compl. ¶¶ 101 & 102.)

## II. The Alleged Corrective Disclosures

On March 18, 2013, the Company disclosed that its management "has identified a material weakness in our internal control over financial reporting" and "[a]s a result of this material weakness, management has concluded that, as of the end of the period covered by this Annual Report on Form 10–K, our internal control over financial reporting was not effective." (Compl. ¶ 113.) The material weakness in internal controls related to the improper capitalization of third party costs paid to investment bankers with respect to the RMS acquisition. *Id.* Plaintiffs allege that the Company's shares fell $8.61 per share to close on March 19, 2013 at $32.98 per share, a drop of over 20%. (Compl. ¶ 114.)

On June 6, 2013, the Company disclosed that it had failed to record certain estimated liabilities relating to RMS's servicing errors and the Company reported that RMS's financial statements and the Company's 8–Ks incorporating those financial statements could no longer be relied upon because the error was material to the RMS balance sheets and income statements. (Compl. ¶ 115.) Plaintiffs do not allege that there was a subsequent drop in stock price relating to the Company's disclosure on June 6, 2013.

On September 24, 2013, the Company restated RMS's financial statements filed on Form 8K, which indicated that it materially understated liabilities with respect to servicing errors. (Compl. ¶ 116.) The liabilities relating to service errors were restated to show that as of June 30, 2012, liabilities increased by $41 million, as of December 31, 2011, liabilities increased by $35 million and as of December 31, 2010, liabilities increased by $20 million. *Id.* Plaintiffs do not allege that there was a

---

**5.** EBITDA refers to earnings before interest, taxes, depreciation and amortization. *Financial Glossary,* Reuters, http://glossary.reuters.com/index.php?title=EBITDA.

subsequent drop in stock price relating to the Company's disclosure on September 24, 2013.

On October 3, 2013, the Company announced the resignation of Charles Cauthen, who served as its Executive Vice President and Chief Financial Officer. (Compl. ¶ 117.) Plaintiffs do not allege that there was a subsequent drop in stock price after the announcement of Defendant Cauthen's resignation.

On November 6, 2013, the Company filed Form 10-Q, which was signed by Defendants O'Brien and Cauthen, with the SEC, in which the Company announced pending investigations with the Department of Housing and Urban Development, the Federal Trade Commission ("FTC") and the Consumer Financial Protection Bureau ("CFPB"). (Compl. ¶ 118.) The Company announced that on October 2, 2013, the Company received a subpoena from the HUD Office of the Inspector General requesting "documents and other information concerning (i) the curtailment of interest payments on HECM loans serviced or sub-serviced by RMS and (ii) RMS's contractual arrangements with a third party vendor for the management and disposition of real estate owned properties." *Id.* Additionally, the Company announced that on October 7, 2013, the CFPB notified Green Tree that its staff was considering recommending action against Green Tree for violations of various federal consumer financial laws. *Id.* The Plaintiffs allege that the Company's shares fell $2.51 per share to close at $33.41 on November 7, 2013. (Compl. ¶ 119.)

On February 27, 2014, the Company announced in a Form 8-K that agents from the FTC and CFPB were seeking authority to bring an enforcement action against Green Tree. (Compl. ¶ 120.) That same day, Defendant Dixon, in commenting on the FTC's and CFPB's investigation, explained that "[w]e were notified last week that they are now recommending an action and will seek approvals to proceed" and stated that "we are very proud of the servicing standards we maintain, our excellent servicer ratings and track record of compliance." (Compl. ¶ 121.) Defendant O'Brien also stated that "[we] remain dedicated to serving the needs of our customers without sacrificing our strong track record of regulatory compliance" and "grew our servicing portfolio with a focus on maintaining our historically high level of compliance and performance." *Id.* Plaintiffs allege that on February 27, 2014 shares of Walter Investment fell from $28.28 to $25.90. (Compl. ¶ 122.)

On August 8, 2014, Defendant Anderson resigned. (Compl. ¶ 123.) Plaintiffs do not allege that there was a subsequent drop in stock price after the announcement of Defendant Anderson's resignation.

On August 11, 2014, the Company disclosed in a Form 10-Q filing that it is pursuing settlement discussions with the government agencies concerning Green Tree. (Compl. ¶ 124.) In the August 11, 2014 Form 10-Q, the Company disclosed that: (i) it had been informed by the FTC and CFPB staffs that "as part of a settlement, they will seek injunctive relief in relation to Green Tree Servicing's business practices, civil money penalties and equitable monetary relief;" (ii) "the CFPB staff has authority to commence an action against Greet Tree Servicing and that the FTC staff has authority to negotiate and would need further FTC approval to file such an action;" and (iii) with respect to the RMS investigation, the Department of Justice had begun investigating possible violations of the False Claims Act. *Id.* Plaintiffs allege that as a result of this disclosure, on August 11, 2014, Walter securities opened at $28 and closed at $24.75, a drop of more than 11%. (Compl. ¶ 126.)

On August 12, 2014, Compass Point Research and Trading LLC issued a report regarding the Company, which noted that the Company's recent stock price decline was caused in part by the Company's August 11, 2014 disclosure concerning the developments with regulators. (Compl. ¶ 127.) Also, on August 12, 2014, analyst FBR Capital downgraded Walter from "Outperform" to "Market Perform" given the rising legal and regulatory costs. (Compl. ¶ 128.)

Finally, on November 6, 2014, the Company filed with the SEC on Form 10-Q its quarterly report for the period ending September 30, 2014, which disclosed that Green Tree was now under investigation by various state attorneys general and state regulators as well as the Office of the United States Trustee concerning its business practices, including its loan servicing practices. (Compl. ¶ 129.) Plaintiffs do not allege that there was a subsequent drop in stock price relating to the Company's disclosure on November 6, 2014.

### PROCEDURAL HISTORY

On December 23, 2014, the Court granted the Defendants' Motions to Dismiss the First Amended Class Action Complaint and ordered Plaintiffs to file a Second Amended Complaint on or before January 6, 2015 in order to cure the deficiencies discussed in the Order, if possible. D.E. 71. On January 6, 2015, the Plaintiffs filed their Second Amended Complaint and this cause is before the Court for the second time on the Defendants' Motions to Dismiss the Second Class Action Complaint.

On March 20, 2015, after the Motions to Dismiss were fully briefed, Plaintiffs requested the Court take judicial notice of (i) Walter Investment Management, Corp.'s ("Walter Investment") February 26, 2015 press release, in which Walter Investment disclosed that it "agreed to a proposed stipulated order with the [Federal Trade Commission] and [Consumer Financial Protection Bureau] which is subject to approval by the FTC, CFPB and the court;" (ii) Excerpts from Walter Investment's Form 10-K for the period ended December 31, 2014, in which Walter Investment disclosed that it agreed to settle the pending FTC/CFPB action against the Company on terms including fines, restitution and injunctive relief; and (iii) the qui tam Complaint filed in *United States ex rel. Matthew McDonald, et al. v. Walter Investment Management Corp., et al.*, No. 8:03-cv-1705-T23-TGW (M.D.Fla. Dec. 4, 2013), which was recently unsealed and filed by RMS's interim CFO who alleges, among other things, that RMS did not comply with certain FHA regulations applicable to the servicing of reverse mortgages and improperly sought interest payments from HUD. D.E. 84. The Court granted Plaintiffs' request to take judicial notice of these documents, *see* D.E. 88, but agreed to take judicial notice of the qui tam Complaint for the limited purpose of "establish[ing] the fact of such litigation and related filings," and not the truth of the allegations contained within. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994) (explaining that in order to be judicially noticed under Federal Rule of Evidence 201 "indisputability is a prerequisite"); *F.D.I.C. v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, No. 8:11-cv-2831-T-33MAP, 2013 WL 1912838, at *2 (M.D.Fla. May 9, 2013) ("The Court takes judicial notice of the state court Amended Complaint and Answer 'for the limited purpose of recognizing ... the subject matter of the litigation.' The Court does not take judicial notice of accuracy of the factual allegations contained within the state court pleadings.") (citation omitted). The Defendants were afforded an opportunity to respond to the judicially noticed documents, D.E. 85, and on April 1, 2015, the Defendants did so, D.E. 86 & 87.

Then on April 24, 2015, Plaintiffs again requested the Court take judicial notice of (i) Press Release, Consumer Financial Protection Bureau, CFPB and Federal Trade Commission Take Action Against Green Tree Servicing for Mistreating Borrowers Trying to Save Their Homes (Apr. 21, 2015); (ii) Press Release, Federal Trade Commission, National Mortgage Servicing Company Will Pay $63 Million to Settle FTC, CFPB Charges (Apr. 21, 2015); (iii) Complaint, *Federal Trade Commission v. Green Tree Servicing, LLC, Corp.*, No. 15–2064 (D.Minn. Apr. 21, 2015); and (iv) Consent Order, *Federal Trade Commission v. Green Tree Servicing, LLC, Corp.*, No. 15–2064 (D.Minn. Apr. 23, 2015). D.E. 90. The Court granted the Plaintiffs' request for judicial notice and allowed the Defendants an opportunity to file a response to the judicially noticed documents, D.E. 93, which were filed on May 1, 2015, D.E. 94 & 95.

### *LEGAL STANDARD*

In order to state a claim for relief, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007).

On a Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim upon which relief can be granted, the court takes the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Edwards v. Prime Inc.,* 602 F.3d 1276, 1291 (11th Cir.2010). The Court does not view each fact in isolation, however, but considers the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Conclusory allegations will not suffice to state a claim; rather, the complaint must allege sufficient facts to state a plausible claim to relief. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). This means that the factual content of the complaint must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Dismissal for failure to state a claim is proper if the factual allegations are not 'enough to raise a right to relief above the speculative level.'" *Edwards,* 602 F.3d at 1291 (quoting *Rivell v. Private Health Care Sys., Inc.,* 520 F.3d 1308, 1309 (11th Cir.2008)).

Securities fraud claims are subject to Fed.R.Civ.P. 9(b)'s heightened pleading requirements. Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." The Eleventh Circuit has stated that Rule 9(b)'s fraud particularity requirement is met as long as the complaint sets forth "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001) (internal quotation marks and citation omitted).

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u–4(b), which made two notable changes to the pleading requirements for securities fraud actions. The Court must dismiss the action if either of these two pleading requirements are not met. *Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1321 (S.D.Fla.2004). First, the PSLRA altered Rule 9(b)'s particularity requirement by mandating the following:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1)(B). Thus, the PSLRA requires greater specificity than Rule 9(b). *Druskin*, 299 F.Supp.2d at 1321.

Second, the PSLRA raised the standard for pleading scienter by making it clear that a plaintiff can no longer plead scienter generally. In order to properly allege scienter, the plaintiff must, for each alleged misrepresentation or omission, "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). "Moreover, the complaint must allege facts supporting a strong inference of scienter for *each defendant* with respect to *each violation.*" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir.2008) (emphasis added) (citing *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir.2004)).

Courts may consider materials that are incorporated by reference into a complaint without converting a motion to dismiss to a motion for summary judgment if the document is (1) central to plaintiff's claim and

(2) undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir.2005) (holding district court did not err by considering a contract central to the dispute without converting the motion to a motion for summary judgment); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999) (recognizing the incorporation by reference doctrine in a securities case). Additionally, the Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the Securities and Exchange Commission ("SEC"). *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir.1999). As the Eleventh Circuit has stated, the "usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in context." *Harris*, 182 F.3d at 802 n. 2.

## DISCUSSION

Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2012).

Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any

means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2012).

In order to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1192, 185 L.Ed.2d 308 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 131 S.Ct. 1309, 1317, 179 L.Ed.2d 398 (2011) (internal quotation marks omitted)).

Defendants Walter Investment, O'Brien, Dixon, Anderson, Corey and Cauthen argue that the Second Amended Complaint should be dismissed because Plaintiffs failed to cure the defects identified by the Court in its December 23, 2014 Order dismissing the First Amended Complaint. D.E. 77. Similarly, Defendant Helm argues that the Second Amended Complaint

should be dismissed because he is mentioned in 10 out of the 229 numbered paragraphs and none of those paragraphs contain any facts supporting the fraud-based claims asserted against him. D.E. 76. The Court will now examine whether the Plaintiffs have sufficiently alleged claims under Section 10(b) and Rule 10b–5 in their Second Amended Complaint.

*I. Material Misrepresentations*

Defendants make several arguments as to whether Plaintiffs have adequately alleged a material misrepresentation. Those arguments are as follows: (i) Defendants Anderson and Corey cannot be held liable under a group pleading theory for any statements made by the Company before they became officers in August 2013; (ii) the Individual Defendants cannot be held liable for RMS's financial statements because they were not the makers of the statements contained therein; (iii) Plaintiffs improperly rely on immaterial statements; and (iv) statements regarding Walter Investment's financial performance are forward-looking statements protected by the PSLRA's safe-harbor provision.[6] In response, Plaintiffs contend that the Defendants may be held liable for the misstatements contained in the RMS financial statements and that Defendants Anderson and Corey can be held liable for statements made before they became officers, but did not rebut the Defendants' remaining arguments. Additionally, Plaintiffs concede that the allegations contained in paragraphs 68, 81, 83, 86, 88, 89, 90, 92, 93, and 109 of the Second Amended Complaint are inactionable. D.E. 79 at 22 n. 12. In the December 23, 2014 Order, the Court found that these allegations are inactionable and therefore,

**6.** The Court notes that Defendants Walter Investment, Anderson, Corey, O'Brien, Dixon and Cauthen do not dispute that they were

the makers of the alleged misrepresentations that are unrelated to the RMS financial statements. *See* D.E. 77 at 8–11.

in analyzing the Defendants' arguments, the Court will only address the 20 alleged material misrepresentations found at paragraphs 79, 80, 82, 84, 85, 91, 95–99, 101, 102, 104–108, 110 & 111.

### A. Can Defendants Anderson and Corey be held liable Under a Group Pleading Theory for statements Attributed to the Company prior to August 2013?

■ Defendants Anderson and Corey argue that prior to August 2013 they were not officers of Walter Investment and as a result, they cannot be held liable under a group pleading theory for statements made by Walter Investment prior to August 2013. The group pleading doctrine "can be broadly characterized as a presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b)." *Phillips*, 374 F.3d at 1018. As the Court noted in its previous Order, the Eleventh Circuit has declined to address whether the group pleading doctrine remains viable after the PSLRA, *see Phillips*, 374 F.3d at 1019, but this Court as well as other courts in the Southern District of Florida "have permitted plaintiffs to attribute allegedly false statements to defendants via group pleading so long as plaintiffs also make the specific factual allegation that [the defendant], due to his high ranking position and direct involvement in the everyday business of the Company, was directly involved in controlling the content of the statements at issue." *Murdeshwar v. Search Media Holdings Ltd.*, No. 11–Civ–20549, 2011 WL 7704347, at *12 (S.D.Fla. Aug. 8, 2011) (internal quotation marks and citation omitted).

Assuming the group pleading doctrine is viable, it is inapplicable to Defendants Anderson and Corey for any misrepresentations made by the Company prior to August 2013. The Second Amended Complaint alleges and the stipulated facts found in the Joint Planning and Scheduling Report establish that Defendant Anderson has served as the Company's Chief Operating Officer since August 2013 and Defendant Corey was appointed Senior Vice President and Chief Compliance Officer for the Company in August 2013. Because Plaintiffs have not alleged that Defendants Anderson and Corey held high-ranking positions prior to August 2013, these Defendants cannot be held liable under the group pleading doctrine for statements made by the Company prior to August 2013, i.e., the statements found in paragraphs 79, 80, 82, 91, 97, 99, 101–102, & 107.

### B. Are the Individual Defendants Makers of the Alleged Misrepresentations Contained in RMS's Financial Statements?

In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S.Ct. 2296, 2302, 180 L.Ed.2d 166 (2011), the Supreme Court of the United States held that only the maker of a misrepresentation may be held liable and defined the maker of a statement as a "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Additionally, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* However, "one who prepares or publishes a statement on behalf of another is not its maker" nor is the person "who provides the false or misleading information that another person then puts into the statement" a maker. *Id.* 2302–04.

■ In the December 23, 2014 Order, the Court found that there were sufficient allegations in the First Amended Complaint to show that Defendant Helm was

the maker of RMS's financial statements. Based on the Court's review of the Second Amended Complaint, this finding remains unchanged. In the Second Amended Complaint, Plaintiffs allege that: (i) "Helm was RMS's Chief Executive, President, Chief Operating Officer and co-founder;" (ii) "Helm ran RMS as a 'hands-on' CEO, oversaw RMS's operations and finances, and made the materially false and misleading statements;" (iii) "Helm also was involved in deciding which disclosures would be made by RMS;" and (iv) "Helm was responsible for the RMS financial statements that were included in the Company's Form 8–K filing ..., which were materially inaccurate and necessitated a restatement." (Compl. ¶¶ 194 & 196.) At this stage in the litigation, the Court must accept the allegations contained in the Second Amended Complaint as true and therefore, the Court finds that Plaintiffs have sufficiently pled that Defendant Helm was the maker of the statements found in RMS's financial statements. As a result, Defendant Helm is legally responsible for statements contained in RMS's financial statements.[7]

Next, Defendants O'Brien, Dixon, Anderson, Corey and Cauthen (the "Walter Individual Defendants") argue that they cannot be held liable for any misrepresentations contained in RMS's financial statements. The Walter Individual Defendants raised this argument in their Motion to Dismiss the First Amended Complaint, and the Court agreed that they could not be held liable for RMS's financial statements because Plaintiffs failed to allege

that they had any control over the creation of RMS's financial statements or allege with particularity that these Defendants vouched for the financial statements or confirmed their accuracy. D.E. 71 at 20. Plaintiffs argue that they have sufficiently cured this defect by alleging that in an October 2012 8–K, Walter Investment stated:

> The following unaudited pro forma condensed combined financial information is based on the historical financial information of Walter Investment Management Corp., or Walter Investment or the Company, GTCS Holdings, LLC, or Green Tree, and Reverse Mortgage Solutions, Inc. and its subsidiaries, or RMS, and has been prepared to reflect the proposed acquisition of RMS by a wholly-owned subsidiary of Walter Investment, or the Acquisition, and the related financing transactions, as well as the contemplated equity and convertible debt raise, collectively, the Transactions. The pro forma data in the unaudited pro forma condensed combined balance sheet as of June 30, 2012 assume that the proposed Transactions had occurred on June 30, 2012.

(Compl. ¶ 91.)

However, this allegation is insufficient to show that the Walter Individual Defendants had any control over RMS's financial statements or vouched for their accuracy. And as the Walter Individual Defendants correctly point out, several other statements in the October 2012 8–K show that they did not vouch for the accuracy of

---

**7.** Defendant Helm also argues that he is not the maker of RMS's financial statements because he did not hold a position at Walter Investment and the financial statements were disclosed by Walter Investment. D.E. 76 at 17. Although RMS's financial statements were disseminated by Walter Investment, that act does not change the fact that the Second Amended Complaint sufficiently alleges that

Defendant Helm was the maker of the statements contained therein because one who publishes a statement on behalf of another is not its maker. Additionally, Defendant Helm's lack of a position at Walter Investment has no bearing on whether he was the maker of the statements contained in RMS's financial statements.

RMS's financial statements. Specifically, in the October 2012 8–K Walter Investment stated:

> The unaudited pro forma condensed combined financial information is presented for informational purposes only and is not intended to reflect the results of operations or the financial position of the combined company that would have resulted had the proposed Acquisition of RMS, the acquisition of Green Tree and the offerings been effective during the periods presented or the results that may be obtained by the combined company in the future ... Future results may vary significantly from the results reflected in the unaudited pro forma condensed combined financial information ... At this time, Walter Investment has not performed a detailed valuation to determine the fair value of RMS's assets and liabilities and accordingly, the unaudited pro forma condensed combined financial information was developed using a preliminary allocation of the estimated purchase price based on assumptions and estimates which are subject to changes that may be material. Additionally, Walter Investment has not yet performed all of the due diligence necessary to identify additional items that could significantly impact the purchase price allocation or the assumptions and adjustments made in preparation of this unaudited pro forma condensed combined financial information.

D.E. 81–1 at 142 & 147.

▉ Plaintiffs concede that the Walter Individual Defendants "were not responsible for RMS's financial statements standing alone" but nevertheless argue that they can be held liable for any misrepresentations in those statements because "they were responsible for, and had control over, the combined statements that the investing public later learned were inaccurate." D.E. 79 at 23. Under Plaintiffs'

theory, Section 10(b) and Rule 10b–5 liability would attach any time a defendant culled together and disseminated information to the public that turned out to be false. However, based on *Janus*, these actions are insufficient to support a finding that a defendant is the maker of the alleged misrepresentation. Because Plaintiffs have failed to allege that the Walter Individual Defendants were the makers of RMS's financial statements, Plaintiffs Section 10(b) and Rule 10(b)(5) claims are dismissed against Defendants Walter Investment, O'Brien, Dixon, Anderson, Corey and Cauthen to the extent they are based on statements contained in RMS's financial statements.

## C. Are the alleged misrepresentations material?

During a September 11, 2012 conference call, Defendant Helm stated: "we take a very aggressive reserve upfront on every loan we originated at the premium to have for those losses and yet we model that every month and update that reserve every month." (Compl. ¶ 195.) Defendant Helm argues that this statement about RMS's reserves for potential losses is immaterial. D.E. 76 at 18. The Court need not address whether the statement in paragraph 195 is material because Plaintiffs have not alleged that Defendant Helm's statement about RMS's reserves for potential losses is misleading or linked it to the alleged misrepresentations contained in RMS's financial statements. As a result, the Court finds that paragraph 195 is inactionable.

Additionally, Defendant Helm argues that Plaintiffs continue to rely on immaterial statements such as those found in paragraphs 88 and 89 of the Second Amended Complaint. D.E. 76 at 18. The Court has already ruled in its December 23, 2014 Order and above that paragraphs

88 and 89 are inactionable and therefore, the Court need not address the viability of these statements again. However, the Court finds that there are other alleged misstatements in the Second Amended Complaint that are not material.

■ "The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.' " *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir.2007) (quoting *S.E.C. v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir.1982)). Materiality is an objective inquiry involving the significance of an omitted or misrepresented fact to a reasonable investor. *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir.2012) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Furthermore, the materiality test "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts" and "these assessments are peculiarly ones for the trier of fact." *Id.* at 1245–46 (quoting *TSC Indus., Inc.*, 426 U.S. at 450, 96 S.Ct. 2126 (internal quotation marks omitted)).

■ A statement that is vague, generalized, non-verifiable, or mere corporate puffery is immaterial because a reasonable investor would not make a decision based on such a statement. *See Mogensen v. Body Cent. Corp.*, 15 F.Supp.3d 1191, 1211 (M.D.Fla.2014) (finding that corporate puffery and generalized, non-verifiable, vaguely optimistic statements are immaterial); *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11–22855–CIV, 2013 WL 3295951, at *12 (S.D.Fla. Apr. 19, 2013) (same). As a result, such statements are inactionable as a matter of law and cannot provide a basis for which to maintain a Section 10(b) claim or Rule 10b–5 claim. *See, e.g., Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enters., Inc.*, 572 Fed.Appx. 713, 716 (11th Cir.2014) (finding that statements about the "rigor" of defendant's processes, the "efficiency" and "accuracy" of its operations and its "effective" staff training were not material because the statements did not assert specific and verifiable facts); *Cutsforth v. Renschler*, 235 F.Supp.2d 1216, 1238–39 (M.D.Fla. 2002) (finding that statements by a company that an acquisition "continues" the company's "dynamic growth" and "adds enhanced value" are inactionable puffery).

■ The Court finds that the following statements cannot form the basis of Plaintiffs' Section 10(b) and Rule 10b–5 claims against any of the Defendants because they are too vague to support a viable claim:

(i) On May 9, 2012, Walter Investment issued its First Quarter 2012 Earnings Presentation to investors, which touted its "servicer rating affirmed or upgraded" and "culture of compliance—strong independent controls and processes for monitoring and managing compliance." (Compl. ¶ 80.)

(ii) In an earnings call held on August 9, 2012, Defendant O'Brien stated: "We have a solid platform with distinct advantages that afford our shareholders a great vehicle for which to participate and a significant growth opportunity within the mortgage servicing sector. We continue to execute for our clients by delivering strong portfolio performance in a regulatory-compliant matter." (Compl. ¶ 84.)

(iii) On November 8, 2012, Walter Investment issued its Third Quarter 2012 Earnings Presentation to investors, which touted the Company's "differentiated servicing model: high level of compliance drives preferred partner status." (Compl. ¶ 99.)

(v) In a May 9, 2013 first quarter 2013 Earnings Presentation and at a June 12,

2013 Morgan Stanley Financials Conference, Defendants represented that the Company's "[h]igh level of compliance drives preferred partner status." (Compl. ¶¶ 106 & 108.)

(vi) On August 8, 2013, the Company issued its Second Quarter 2013 Earnings Presentation to investors, which touted the Company's servicing business by stating that a "high level of compliance drives preferred partner status" and "[r]eceived servicer rating upgrades from Fitch Ratings, making Green Tree top rated specialty servicer." (Compl. ¶ 110.)

**D. Are statements regarding Walter Financial's performance forward-looking statements subject to the PSLRA's safe-harbor provision?**

According to the PSLRA, the term "forward-looking statement" means:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i)(1).

Defendant Helm argues that statements relating to the benefits of the RMS acquisition found at paragraphs 68, 88 and 89 are forward-looking and thus, protected by the PSLRA's safe-harbor provision. D.E. 76 at 19. Plaintiffs concede that the alleged misstatements concerning the benefits of the RMS acquisition are inactionable. *See supra* p. 1353. Therefore, the Court need not address whether these statements are protected by the PSLRA's safe-harbor provisions.

Defendant Helm further argues that the alleged misstatements included in Walter Investment's SEC filings, Compl. ¶¶ 79, 82, 90–92, 101, and 107, are protected by the PSLRA's safe-harbor provision. D.E. 76 at 19–20. Again, Plaintiffs concede that paragraphs 90 and 92 are inactionable; therefore, the Court will not address whether the statements contained in those paragraphs are forward-looking statements. *See supra* p. 1353. As for paragraphs 79, 82 & 107, the Court found in its December 23, 2014 Order that those paragraphs do not contain forward-looking statements. Rather, the statements focus on set financial figures, such as revenue and net income, as of specific time periods. And the statements in paragraphs 91 and 101 refer to documents that may contain forward-looking statements but are not themselves forward-looking. Therefore, the Court finds that the statements contained in paragraphs 79, 82, 91, 101, and 107 of the Second Amended Complaint are not protected by the PSLRA's safe-harbor provision.

## II. Scienter

 The Supreme Court has defined the level of scienter necessary to support a securities fraud claim as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In order to adequately plead scienter in the Eleventh Circuit, a plaintiff must allege facts creating a "strong inference" that the defendant acted purposefully or with "severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir.2010); *Ziemba*, 256 F.3d at 1202. A "strong inference" is one that is "cogent" and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314, 127 S.Ct. 2499. And severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Ziemba*, 256 F.3d at 1202 (internal quotation marks and citation omitted).

 Stated differently, in order to sufficiently allege scienter, a plaintiff must allege facts from which a reasonable person would infer that it is at least as likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it), learned about the alleged fraud, or were otherwise severely reckless in not learning of the alleged fraud when they made the purportedly false or misleading statements. *See Mizzaro*, 544 F.3d at 1247. *See also Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1302 (11th Cir.2015) ("Accordingly, [a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged:.... Although we draw any reasonable inferences available on the face of the complaint in the investors' favor, we also must look to plausible, nonculpable explanations for the defendant's conduct in evaluating an inference of scienter.") (internal quotation marks and citation omitted). The Court must not scrutinize each of Plaintiffs' allegations in isolation, but rather assess all of the allegations holistically. *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499.

Finally, the "complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238. Thus, the group pleading doctrine does not apply to the PSLRA's scienter requirements. *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1341 (S.D.Fla.1999) (holding that the group pleading doctrine survives the PSLRA as to Rule 9(b)'s particularity requirements, but does not apply to the PSLRA's scienter requirements); *Druskin*, 299 F.Supp.2d at 1322 (same).

As a threshold matter, the Court notes that the Second Amended Complaint includes scienter allegations that improperly group the Defendants as "Individual Defendants" or "Defendants" instead of clearly distinguishing how each defendant acted purposefully or with severe recklessness. *See, e.g.*, Compl. ¶¶ 132 & 149. As the Court made clear in its December 23, 2014 Order, this is insufficient under Rule 9(b) and the PSLRA, which requires Plaintiffs to allege what each Defendant knew, how the Defendant knew that information and when each Defendant knew or should have known that information. *See City of St. Clair Shores Gen. Emps. Ret. Sys. v. Lender Processing Servs., Inc.*, No. 3:10–cv–1073–J–32JBT, 2012 WL 1080953, at *4

(M.D.Fla. Mar. 20, 2012) (dismissing complaint without prejudice because plaintiff failed to allege scienter with respect to each defendant); *Durham v. Whitney Info. Network, Inc.*, No. 06–CV–00687, 2009 WL 3783375, at \*17 (M.D.Fla. Nov. 10, 2009) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.") (internal quotation marks and citation omitted). Therefore, to the extent allegations supporting scienter are not attributed to a specific Defendant, those allegations will be disregarded in the Court's analysis on scienter. Additionally, to the extent that Plaintiffs rely on conclusory allegations without any supporting factual allegations, those allegations are insufficient to support a finding of scienter and they too will be disregarded.

The Court will now address whether the Plaintiffs have sufficiently alleged scienter for each Defendant.

*A. Defendant Helm*

Defendant Helm stands accused of overstating RMS's financial performance in its financial statements and failing to disclose material weaknesses in RMS's internal controls in Walter Investment's public filings, press releases, announcements and other communications during the Class Period. Plaintiffs maintain that the following facts give rise to a strong inference that Defendant Helm acted with scienter: (i) his role as an officer of RMS; (ii) his receipt of 156,071 Walter Investment shares in the RMS acquisition; (iii) RMS was a core businesses of Walter Investment; (iv) Helm was responsible for conducting due diligence on RMS's financial statements; (v) Helm's resignation; (vi) the size of the restatement of RMS's financial statements; (vii) the alleged misrepresentations about the value of the RMS acquisition; and (viii) Helm's financial motivation to keep Walter Investment's stock artificially inflated.[8] Defendant Helm disagrees. D.E. 76 at 5–13.

While the Court agrees that scienter cannot be inferred merely from a defendant's position, *Durgin v. Mon*, 415 Fed. Appx. 161, 165 (11th Cir.2011) (finding that defendants' positions in the company was not evidence that defendants knew of the alleged fraud and therefore, could not support a finding of scienter), the Second Amended Complaint goes further than relying on Defendant Helm's position. Specifically, the scienter allegations in respect of Defendant Helm include the following:

- Knowledge: Defendant Helm participated in the fraudulent scheme by virtue of his receipt of information reflecting the true facts of RMS and his

---

**8.** Plaintiffs also rely on statements about the RMS acquisition, the alleged misrepresentations concerning Walter Investment's internal controls and regulatory compliance, motives to keep Walter Investment's stock artificially inflated that are applicable only to the Walter Individual Defendants and red flags involving Green Tree to support a strong inference that Defendant Helm acted with scienter. The Court has already addressed the statements about the RMS acquisition and have found them to be inactionable. *See supra* pp. 1353–59. Therefore, the Court need not address any of the Defendants' arguments that there can be no inference of scienter from these statements. Similarly, the Court has previously found in its December 23, 2014 Order that Defendant Helm is not a maker of statements relating to Walter Investment or Green Tree and therefore, the Court need not address whether the alleged misrepresentations concerning Walter Investment's internal controls and regulatory compliance, motives to keep Walter Investment's stock artificially inflated that are applicable only to the Walter Individual Defendants and red flags involving only Green Tree support an inference that Defendant Helm acted with scienter.

control over, receipt of or modification of RMS's allegedly materially misleading misstatements made him privy to confidential proprietary information concerning RMS. In addition, Helm's knowledge included awareness of the existence of pervasive regulatory compliance issues at RMS, accounting issues, including the understatement of servicing liabilities, and material weaknesses which resulted in materially inaccurate reported financial results. Helm knew or recklessly disregarded the material adverse facts concerning the servicing violations and other legal violations that plagued RMS. (Compl. ¶ 131.)

● Knowledge: The qui tam complaint includes an allegation that RMS's interim CFO, Matthew McDonald, had direct conversations with Defendant Helm about RMS's decision not to self-curtail. To self-curtail means to disclose the failure to meet processing deadlines on insurance claims as required by the Federal Housing Administration's regulations and Defendant Helm knew of RMS's failure to do so. D.E. 84 & 84–4.

● Knowledge & Access: Defendant Helm was RMS's Chief Executive, President, Chief Operating Officer, and Co–Founder. Helm ran RMS as a "hands-on" CEO and oversaw RMS's operations and finances. He was intimately knowledgeable about all aspects of RMS and Walter Investment's financial and business operations. Helm received daily reports and had access to computerized information regarding servicing requirements, disclosures, processes and errors, internal controls, financial results and the valuation of acquisitions. Helm also was involved in deciding which disclosures would be made by RMS. As a result of his access to information, Defendant Helm knew, or recklessly disregarded,

the material adverse facts concerning the servicing violations and other legal violations that plagued RMS. (Compl. ¶ 194.)

● Core Operation: RMS represents a core operation of Walter Investment and as Co–Founder, President, Chief Operating Officer and Chief Executive Officer of RMS, Defendant Helm may be deemed to have knowledge of rampant improprieties at RMS. (Compl. ¶¶ 143–44.)

● Due Diligence: Defendant Helm recklessly failed to ensure, through due diligence, that RMS's financial statements were reliable—further probative of scienter. The Stock Purchase Agreement filed with the SEC on September 6, 2012 specifically referred to disclosures regarding servicing errors that RMS made to Walter Investment in a disclosure schedule appended to the Stock Purchase Agreement. Defendant Helm was responsible for ensuring the accuracy of RMS's books and records, and, absent severe recklessness, would have been aware that RMS materially understated servicing liabilities. (Compl. ¶ 145.)

Restatement: The enormous size of the restatement supports a strong inference that Defendant Helm knew, or recklessly disregarded, that RMS's financial statements were materially false when made. Indeed, the restatement wiped out RMS's net income for the entire year ended December 31, 2011 and turned it into a multi-million dollar loss. Specifically, as a result of the restatement, RMS's expenses for the six months

ended June 30, 2012, increased 35%, from $18,729,000 to $25,175,000. Net income for the same period was reduced by 66%, from $6,147,000 to $2,106,000. For the year ended December 31, 2011, RMS's expenses were restated from $26,279,000 to $41,187,000, an increase of 57%, and net income was restated from $5,256,000 to a loss of $4,091,000. RMS's restated servicing liabilities were increased for $41 million for the period ended June 30, 2012, approximately 30% of the purchase price paid for RMS. (Compl. ¶ 146.)

Resignation: Two months after the restatement of RMS's financial statements, on December 3, 2013, Defendant Helm resigned from RMS, citing "recent struggles the industry has faced due to regulatory pressures and product changes." (Compl. ¶ 147.)

- Position & Duties: Helm was responsible for creating RMS's corporate protocols for ensuring compliance. RMS's faulty servicing platform was developed in-house—i.e., under the supervision of Defendant Helm. In a September 11, 2012 conference call, Helm spoke knowledgeably about RMS's reserves for potential loses, stating "we take a very aggressive reserve upfront on every loan we originated at the premium to have for those losses and yet we model that every month and update that reserve every month." (Compl. ¶ 195.)

- Position & Duties: Defendant Helm was responsible for the RMS financial statements that were included in the Company's Form 8–K filing dated October 15, 2012, which were materially inaccurate and necessitated a restatement. RMS's restated servicing liabilities were increased for $41 million for the period ended June 30, 2012, approximately 30% of the purchase price paid for RMS. (Compl. ¶ 196.)

- Bonus/Compensation: Moreover, Helm received 156,071 Walter Investment shares in the RMS acquisition. On the date he acquired the shares, at $27.99 per share, the stock had a total value of $4,368,427—a significant incentive to push through the RMS acquisition. Thus, Defendant Helm was motivated to understate RMS's servicing liabilities to ensure that the acquisition would proceed. (Compl. ¶ 197.)

While the above represents an expansion of Plaintiffs' scienter allegations since their First Amended Complaint, viewing the allegations holistically, the Court nonetheless finds that the allegations do not create a strong inference that Defendant Helm acted with scienter for the reasons explained below.

First, the Court finds that the size of the restatement of RMS's financial statements does not support an inference of scienter because Plaintiffs have chosen to present the restated amounts as a percentage of net income instead of total revenue. As the Eleventh Circuit explained in *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, "[b]ecause net income can vary so widely period to period, using it as a baseline for comparison provides the court no real standard on which to judge the significance of the accounting error." 594 F.3d 783, 792 (11th Cir.2010) (affirming district court's finding that plaintiffs failed to adequately allege scien-

ter because, among other things, plaintiffs failed to present the restated amounts as a percentage of total revenue). The Court held in its December 23, 2014 Order that Plaintiff failed to sufficiently allege that Defendant Helm acted with scienter because, among other things, it was not clear how RMS's increased liabilities affected the total revenue of RMS and Walter Investment. By using net income, Plaintiffs have adopted the "pleading strategy [of] picking the metric that will yield the highest percentage values" and such a strategy "adds nothing to the inference of scienter that the shareholders attempt to create." *Id.* In fact, the Court can only infer from Plaintiffs' failure to allege the restatement in terms of total revenue that the magnitude of the restatement does not support a finding that Defendant Helm was severely reckless in not knowing that RMS's financial statements were false. Because the Court cannot determine whether the size of the restatement is significant, this allegation does not support a finding that Defendant Helm acted with scienter.

Additionally, given the Court's inability to assess the significance of the size of the restatement, the Court cannot determine whether the errors were so obvious that Defendant Helm's due diligence should have revealed them. As a result, Defendant Helm's lack of due diligence does not support an inference of scienter.

■ Second, the Court is unpersuaded that the fact and timing of Defendant Helm's resignation, standing alone or together with the other facts alleged, supports a finding of scienter. The Court previously found in its December 23, 2014 Order that Defendant Helm's resignation is insufficient to establish a strong inference of scienter because there are several other inferences of nonfraudulent intent that can be inferred from his departure. Plaintiffs now allege that Defendant Helm's reason for leaving was due to "re-cent struggles the industry has faced due to regulatory pressures and product changes" and cite to an article written by John Yedinak that was published on Reverse Mortgage Daily's website. (Compl. ¶ 147 & n. 4.)

"Various courts have recognized that an executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation." *Brophy,* 781 F.3d at 1305 (citation omitted). Defendant Helm's resignation two months after the restatement of RMS's financial statements weighs in favor of a finding of scienter; however, Plaintiffs' allegation that Defendant Helm resigned from RMS due to regulatory pressures is both conclusory and misleading. According to Mr. Yedinak's article, Defendant Helm "was leaving [RMS] to pursue other interests" and "RMD spoke with Helm, who said that despite some of the recent struggles the industry has faced due to regulatory pressures and product changes, he still believes it's a good business to be in." John Yedinak, *Reverse Mortgage Solutions Sees CEO Marc Helm Leave,* Reverse Mortgage Daily (Dec. 3, 2013), available at http://reversemortgage daily.com/2013/12/03/reverse-mortgage-solutions-sees-ceo-marc-helm-leave/. Defendant Helm is quoted as saying "It's a great place to be, but that does not mean it will not be without challenges ... The reverse mortgage industry, although 25 years old, is still just a toddler. We all have a great opportunity to help shape the future of the industry and specifically product development." *Id.* In sum, the article does not support Plaintiffs' allegation that Defendant Helm resigned due to regulatory issues but the timing of his resignation lends support to Plaintiff's claim that Defendant Helm made the alleged misstatements with scienter.

Third, for the reasons discussed above, *see supra* p. 1350, the Court cannot accept the allegations contained in the qui tam complaint as true and therefore, the qui tam complaint does not weigh in favor of a finding that Defendant Helm acted with scienter.[9]

Fourth, Plaintiffs' allegations that RMS is a core operation and therefore, knowledge of the falsity of RMS's financial statements can be imputed to Defendant Helm are also insufficient to create a strong inference of scienter. Aside from the conclusory allegation that RMS is a core operation of Walter Investment, Plaintiffs have not alleged any facts to support that allegation such as the total revenue derived from RMS as a percentage of the total revenue of Walter Investment. Additionally, Plaintiffs have not alleged that RMS, standing alone, represented a substantial source of income for Walter Investment nor have they alleged the effect of RMS's acquisition on Walter Investment's earnings. *Compare* Compl. ¶¶ 141 & 142, *with* Compl. ¶ 143. *See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 489–91 (S.D.N.Y.2004) (finding that courts have imputed knowledge of falsity of a company's financial statements to officers when the subsidiary was a core operation and noting that courts have done so based on the importance of the acquisition, such as an $8.9 billion acquisition, and when a subsidiary was a significant source of income).

Fifth, the Court finds that Plaintiffs' allegation that Defendant Helm's receipt of Walter Investment shares, with a total value of $4,368,427, motivated him to understate RMS's servicing liabilities is insufficient to support a finding of scienter. "Receipt of a standard incentive-based bonus has limited probative value for scienter." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F.Supp.2d 1253, 1275 (M.D.Fla.2009) (finding that an extraordinary incentive package provides circumstantial evidence of scienter but that there could be no inference of scienter because plaintiff failed to allege facts demonstrating that any defendant received or had the potential to receive an extraordinary bonus.). *See also Philadelphia Fin. Mgmt. of San Francisco, LLC*, 572 Fed. Appx. at 718 ("[A] personal financial incentive, standing alone, is insufficient to establish a strong inference of actual fraud."). Also, high compensation packages are a common factor for many companies and therefore, the inference drawn from a high compensation package is limited. *Meyer v. St. Joe Co.*, No. 5:11–cv–27/RS–EMT, 2012 WL 94584, at *11 (N.D.Fla. Jan. 12, 2012) (finding that plaintiff's arguments regarding defendants' motives are unpersuasive because "[h]igher compensation packages, debt covenants

9. Even if the Court did accept the allegations in the qui tam complaint as true, it is unclear what inference should be drawn from the allegations contained therein. Defendant Helm is mentioned only in paragraph 35 of the qui tam complaint, which reads in full: Further, Realtor, McDonald had direct conversations with Mark Helm (CEO of RMS) in which Mr. Helm divulged his direct conversations with the CEO of Celink about Celink engaging in the same fraudulent scheme as RMS and other Defendants (detailed above), by not complying with the preconditional acts of procuring an appraisal and/or initiating "first legal action" yet nevertheless filing insurance claims with HUD for reimbursement despite this non-compliance. D.E. 84–4 at 15. This paragraph could be read to mean that RMS and Celink were engaged in similar fraudulent schemes and that Defendant Helm disclosed his knowledge of Celink's fraud to Mr. McDonald or it could be read to mean that Defendant Helm was aware that Celink and RMS were engaging in the same fraudulent scheme and disclosed that fact to Mr. McDonald.

and approaching stock offerings are common factors affecting many companies"). Here, Plaintiffs have not alleged that Defendant Helm received the shares as a bonus or part of his compensation package. Nevertheless, whether the shares were a bonus or compensation, this allegation fails to create a strong inference of scienter because the Plaintiffs have not alleged that the allotment of shares was extraordinary.

 Sixth, and lastly, Plaintiffs allege that Defendant Helm had access to facts contradicting public statements, he was responsible for RMS's financial statements as well as its books and records, and developed RMS's corporate protocols for compliance. However, Plaintiffs have not alleged what specific information alerted Defendant Helm to errors in RMS's financial statements. Nor have they alleged that Defendant Helm was severely reckless in disregarding corporate protocols or his process for reviewing RMS's financial statements, books and records, which would have revealed the errors. As a result, the Court finds that allegations of Defendant Helm's oversight and control of the processes that produced RMS's financial statements are insufficient to create a strong inference of scienter. *Brophy*, 781 F.3d at 1302 (requiring particularized allegations that executives knew or were severely reckless in disregarding how the processes that produce the company's financial statements were distorted by fraud).

In sum, viewing Plaintiffs' allegations individually and in the aggregate, the facts set forth in the Second Amended Complaint do not create a strong inference that Defendant Helm acted with scienter and therefore, he must be dismissed from this action.

## B. The Walter Individual Defendants

Defendants O'Brien, Dixon, Anderson, Corey and Cauthen argue that (i) the May 9, 2012 and August 9, 2012 misstatements, which the Court found were corrected by the Company's March 19, 2013 disclosure, remain inactionable because the Plaintiffs have not alleged that those specific statements were made with scienter; (ii) Plaintiffs' Second Amended Complaint should be dismissed because they have repackaged scienter arguments already rejected by the Court; and (iii) Defendants' sales of Walter Investment's securities do not support a strong inference of scienter. D.E. 77 at 13–25.

The Court will first identify the scienter allegations for the Walter Individual Defendants and then discuss whether Plaintiffs have adequately alleged a strong inference of scienter in the Second Amended Complaint.

### 1. Allegations of Scienter Applicable to All of the Walter Individual Defendants

In general, Plaintiffs allege that the following red flags should have alerted the Walter Individual Defendants to the alleged fraud: (i) numerous regulatory investigations into Green Tree's business practices, one of which developed into an enforcement action that was settled after Green Tree agreed to pay $48 million dollars to victims, $15 million dollars as a civil penalty and to be subjected to injunctive relief; (ii) internet postings by current and former Green Tree employees showing that Green Tree fostered a coercive and illegal approach to its collection practices; (iii) lawsuits filed by individuals complaining about Green Tree's abusive collection practices; (iv) consumer complaints against Green Tree regarding its abusive collection practices, failure to apply payments to mortgage accounts, harassment of customers, improper loan modifications and improper foreclosure practices; and (v) a petition calling for the cessation of

Green Tree's inaccurate billing and reporting of customer payments as well as aggressive accounting tactics. (Compl. ¶¶ 132–40.)

Additionally, Plaintiffs allege that knowledge of the fraud can be imputed to the Walter Individual Defendants because RMS and Green Tree were core businesses of Walter Investment.[10] (Compl. ¶¶ 141–44.) Moreover, Plaintiffs allege that the Walter Individual Defendants, through their conduct of due diligence, should have known that RMS's financial statements were unreliable and the magnitude of the restatement of RMS's financial statements should have alerted the Walter Individual Defendants to the falsity.[11] (Compl. ¶¶ 145–46.)

Furthermore, Plaintiffs allege that a confidential witness confirms that Green Tree engaged in deceptive and abusive collection practices. (Compl. ¶ 60.)

Lastly, Plaintiffs allege that the Walter Individual Defendants were motivated to keep the price of Walter Investment's stock artificially inflated in order to comply with and facilitate debt and revolving loan agreements, to facilitate the issuance of new stock options, and to facilitate the Company's acquisition of numerous companies, especially the purchase of RMS. (Compl. ¶¶ 148–50, 158, 166, 173, 183 & 193.)

### 2. Specific Allegations Against the Walter Individual Defendants

Plaintiffs contend that the Walter Individual Defendants are responsible for all the misrepresentations alleged in the Second Amended Complaint due to: (i) their role and position at Walter Investment or Green Tree; (ii) their knowledge or access to facts contradicting public statements; (iii) red flags which the Walter Individual Defendants either ignored or willfully failed to acknowledge; (iv) their resignations; (v) their suspicious stock trading; (vi) their Sarbanes–Oxley certifications; and (vii) the bonuses they received.

### i. Defendant Anderson

In support of a finding that Defendant Anderson acted with scienter, Plaintiffs alleges the following:

- Knowledge & Access: As president and Chief Executive Officer of Green Tree, and later as Chief Operating Officer of Walter, Defendant Anderson was a "hands-on" manager, knowledgeable regarding all aspects of Walter Investment's and Green Tree's business and responsible for overseeing all aspects of Walter Investment's business, including regulatory and compliance matters. Defendant Anderson received daily reports and had access to computerized information regarding servicing requirements, disclosures, processes and errors, internal controls, financial results and the valuation of acquisitions. Defendant Anderson also was involved in deciding which disclosures would be made by the Company. Moreover, Defendant Anderson spoke knowledgeably about the regulatory issues facing Green Tree. (Compl. ¶¶ 175–76.)

---

**10.** As discussed above, Plaintiffs have conclusory alleged that RMS is a core operation and therefore, the Court cannot impute knowledge of the falsity of the financial statements to the Walter Individual Defendants. *See supra* pp. 1363–64.

**11.** The Court has already held that it cannot determine the significance of the restatement of RMS's financial statements because Plaintiffs have presented the size of the restatement in terms of net income instead of total revenue. *See supra* pp. 1362–63. As a result, the Court will not discuss whether the size of the restatement creates a strong inference of fraud or whether, through due diligence, the Walter Individual Defendants should have noticed the accounting errors.

- Red Flags: As Green Tree's CEO and President from 2011 until August 8, 2014, Defendant Anderson was on notice of pending government investigations and would have received regular updates on the status and developments of these investigations. Therefore, he knew of the underlying business practices that were under investigation and which the government is now seeking to enjoin. Despite that knowledge, Defendant Anderson continued to make positive statements regarding the Company's regulatory compliance. (Compl. ¶ 177.) [12]

- Resignation: Defendant Anderson resigned from his position at a highly suspicious time, on August 8, 2014, just days prior to the Company's disclosure that the government was seeking injunctive relief and fines from Green Tree. (Compl. ¶ 178.)

- Suspicious Stock Trading: Defendant Anderson had a strong personal motivation to keep Walter Investment's stock price inflated, even if that meant misrepresenting the state of the Company's internal controls and compliance with state and federal regulations. During the Class Period, Defendant Anderson sold over 50% of his Walter Investment stock for proceeds and profits of more than $1 million. Defendant Anderson's Class Period sales were grossly disproportionate to his insider sales during the Comparison Period, which is evidenced by the fact that Defendant Anderson sold no shares of Walter stock during the Comparison Period. (Compl. ¶¶ 179–80.)

- Suspicious Stock Trading: Defendant Anderson's insider sales profits substantially augmented his base salary. Defendant Anderson's base salary was $430,000 for 2013 and his stock sales generated proceeds of over three times his annual salary. The significant ratio of insider sales proceeds to compensation is probative of Defendant Anderson's scienter. (Compl. ¶ 181.)

- Bonus: Defendant Anderson also was motivated to misrepresent the state of Green Tree's regulatory compliance in order to obtain a significant annual bonus. In 2013, Defendant Anderson received over $800,000 and in 2012, he received $801,351. This compensation "took into account the successful integration of the Green Tree business, the significant financial initiatives that were undertaken in 2012, the opportunistic expansion of the Company's business (both in size and product portfolio) and the continued strong regulatory compliance of the business." (Compl. ¶ 182.)

Additionally, Plaintiffs allege that Defendant Anderson received personal emails regarding Green Tree's compliance deficiencies and deceptive practices. Specifically, Plaintiffs allege: (i) "A February 6, 2012 posting by one consumer who resorted to writing directly to Defendant Anderson to complain about Green Tree's deceptive foreclosure practices;" (ii) "An April 19, 2012 posting by another consumer complains that Green Tree failed to comply with home loan modification procedures. The consumer submitted the complaint to the FTC and emailed Defendant Anderson in an attempt to resolve the problem;" and (iii) "An October 25, 2013 posting by another consumer who directly emailed Defendant Anderson regarding numerous servicing errors on a mortgage account claims that the email 'did generate a response.'" (Compl. ¶ 59.)

12. According to the uncontested facts in the Joint Planning and Scheduling Report, Defendant Anderson resigned on August 8, 2014 not August 8, 2013. D.E. 82 at 4.

### ii. Defendant Corey

In support of a finding that Defendant Corey acted with scienter, Plaintiffs allege the following:

- Position: Defendant Corey has served as Senior Vice President and Chief Compliance Officer for Walter Investment, and as Green Tree's Senior Vice President, General Counsel and Secretary. (Compl. ¶ 184.)

- Knowledge & Access: Defendant Corey presided over Green Tree's legal and compliance departments during the time that Green Tree was besieged by consumer complaints and lawsuits concerning Green Tree's abusive and illegal practices. (Compl. ¶ 186.)

- Knowledge & Access: As a "hands-on" manager, Defendant Corey was specifically charged with management and oversight for the Company's regulatory compliance, and for Green Tree's legal affairs and compliance. Defendant Corey received daily reports and had access to computerized information regarding servicing requirements, disclosures, Green Tree's processes, internal and compliance controls, and financial results. Defendant Corey also was involved in deciding which disclosures would be made by the Company. (Compl. ¶ 187.)

- Knowledge: In an investor call dated September 11, 2012, Defendant Corey was described as "the leader of our compliance group. He's the one that's out in front of our businesses today, making sure we're looking out for any risks that could confront us, both from a customer perspective, from a regulatory perspective and from a client perspective." On that same call, Defendant Corey indicated that he was very knowledgeable regarding regulatory issues and offered to spend the entire morning explaining the regulatory aspect of the business. Defendant Corey stated that he holds regular meetings with "senior management at least monthly where we review law changes and go through implementation to make sure that we remain on track. Next, we prepare policies and procedures, forms and employee alerts, and all of those are reviewed by the compliance department before they're implemented." (Compl. ¶ 188.)

- Knowledge: Defendant Corey acted as the spokesperson for Green Tree in handling consumer complaints and lawsuits, indicating his hands on involvement in the company's consumer litigation and familiarity with the underlying facts and allegations concerning consumer complaints. (Compl. ¶ 189.)

- Knowledge: Corey certified in a court filing that he had "personal knowledge" and he was "fully familiar with Green Tree's policies, procedures, and operation pertaining to foreclosure processing." (Compl. ¶ 189.)

- Red Flags: Defendant Corey joined Green Tree in 1995—prior to the commencement of the current regulatory investigations. Therefore, he was apprised of these investigations from their inception, and all subsequent developments in the investigations, and was knowledgeable with respect to the business practices under investigation which the government now seeks to enjoin. (Compl. ¶ 185.)

- Red Flags: Given Corey's position and long tenure with Green Tree, and his demonstrated hands-on involvement in the Company's day-to-day legal affairs and compliance, a strong inference arises that he was aware of the widespread consumer complaints and lawsuits alleged herein, Green Tree's failure to meet over 30% of basic compliance metrics as evidenced

by the report of the Office of Mortgage Oversight, the numerous government investigations of Green Tree that pre-dated and continued into the Class Period, and the abusive consumer practices that the FTC and CFPB now seek to enjoin. Despite Defendant Corey's knowledge of the material adverse facts concerning the servicing violations and other legal violations that plagued Green Tree, he continued to make positive statements concerning the Company's regulatory compliance. (Compl. ¶ 190.)

- Suspicious Stock Trading: Defendant Corey had a strong motivation to keep Walter Investment's stock price inflated, even if that meant misrepresenting the state of the Company's internal controls and compliance with state and federal regulations. Defendant Corey sold substantial amounts of his Walter Investment stock, over 30%, while in possession of material adverse information about the Company and Green Tree, and therefore, derived a personal and concrete benefit from the fraud, generating profits of over $500,000. Defendant Corey's Class Period insider sales were grossly disproportionate to his prior trading history because he sold no Walter Investment stock during the Comparison Period. (Compl. ¶¶ 191–92.)

### iii. Defendant O'Brien

In support of a finding that Defendant O'Brien acted with scienter, Plaintiffs allege the following:

- Knowledge & Access: Defendant O'Brien, as CEO and Chairman of the Board of Directors for Walter Investment, was the person ultimately responsible for ensuring Walter Investment's regulatory compliance. Defendant O'Brien ran Walter Investment as a "hands-on" CEO and oversaw Walter Investment's operations and finances. Defendant O'Brien was intimately knowledgeable about all aspects of Walter Investment's financial and business operations. Defendant O'Brien received daily reports and had access to computerized information regarding servicing requirements, disclosures, processes and errors, internal controls, financial results and the valuation of acquisitions. Defendant O'Brien also was involved in deciding which disclosures would be made by the Company and signed Walter Investment's filings with the SEC during the Class Period, including certificates filed pursuant to SOX stating the financial reports were accurate and complied with GAAP. (Compl. ¶ 152.)

- Knowledge: During the Class Period, Defendant O'Brien made specific statements concerning Walter Investment's regulatory compliance issues, indicating that he was knowledgeable of the relevant underlying facts concerning the Company's compliance and internal controls. (Compl. ¶ 153.)

- Red Flags: Given Defendant O'Brien's position within the Company, and his demonstrated hands-on involvement in the Company's day-to-day affairs and compliance, a strong inference arises that he was aware of the widespread consumer complaints and lawsuits alleged herein, Green Tree's failure to meet over 30% of basic compliance metrics as evidenced by the report of the Office of Mortgage Oversight, the numerous government investigations during the Class Period, and the abusive consumer practices that the FTC and CFPB now seek to enjoin. Despite Defendant O'Brien's knowledge of the material adverse facts concerning the servicing violations and other legal violations that plagued the Company, he continued to make positive

statements concerning its regulatory compliance. (Compl. ¶ 154.)

- Suspicious Stock Trading: Defendant O'Brien had a strong motivation to keep Walter Investment's stock price inflated, even if that meant misrepresenting the state of the Company's internal controls and compliance with state and federal regulations. During the Class Period, Defendant O'Brien sold over $1.7 million worth of Walter Investment stock at prices that were artificially inflated by the fraud. Because all of Defendant O'Brien's stock was granted to him for no money, all of the proceeds constituted profit. (Compl. ¶ 155.)

- Suspicious Stock Trading: Defendant O'Brien's insider sales during the Class Period substantially augmented his base salary. Defendant O'Brien's base salary was $575,000 for 2013 and his Class Period stock sales generated proceeds more than three times his annual salary. (Compl. ¶ 156.)

- Bonus: Defendant O'Brien's bonus compensation plan directly correlated his bonus to the Company's earnings and stock value. For year-end 2012, Defendant O'Brien received $1 million in 2013 and $1.03 million in 2013 in incentive compensation based on this plan. This compensation "took into account the successful integration of the Green Tree business, the significant financial initiatives that were undertaken in 2012, the opportunistic expansion of the Company's business (both in size and product portfolio) and the continued strong regulatory compliance of the business." (Compl. ¶ 157.)

#### iv. Defendant Dixon

In support of a finding that Defendant Dixon acted with scienter, Plaintiffs allege the following:

- Knowledge & Access: Defendant Dixon, as the Company's Vice Chairman and Executive Vice President, received information reflecting the true facts regarding Walter Investment. Dixon received daily reports and had access to computerized information regarding servicing requirements, disclosures, processes and errors, internal controls, financial results and the valuation of acquisitions. Defendant Dixon also was involved in deciding which disclosures would be made by the Company and as a "hands-on" manager, he oversaw Walter Investment's operations and finances. (Compl. ¶ 159.)

- Knowledge: Defendant Dixon spoke knowledgeably about regulatory issues. Defendant Dixon's public statements indicate that he was knowledgeable of the relevant underlying facts concerning the Company's compliance and internal controls. (Compl. ¶ 160.)

- Red Flags: Defendant Dixon knew of, or recklessly disregarded, the material adverse facts concerning the servicing violations and other legal violations that plagued RMS and Green Tree. RMS and Green Tree constituted a substantial source of revenue for the Company, and were core operations of the business, including the servicing of loans. In fact, after the Green Tree acquisition, the servicing portfolio represented the most significant portion of the Company's revenue base. Given Defendant Dixon's position with the Company, and his demonstrated hands-on involvement in the Company's day-to-day affairs and compliance, a strong inference arises that he was aware of the widespread consumer complaints and lawsuits alleged herein, Green Tree's failure to meet over 30% of basic compliance metrics as evidenced by the report of the Office of Mortgage Oversight, the numerous

government investigations during the Class Period, and the abusive consumer practices that the FTC and CFPB now seek to enjoin. Despite Defendant Dixon's knowledge of the material adverse facts concerning the servicing violations and other legal violations that plagued the Company, he continued to make positive statements concerning its regulatory compliance. (Compl. ¶ 161.)

- Suspicious Stock Trading: Defendant Dixon was motivated to keep the price of Walter Investment stock inflated because it enabled him to sell substantial amounts of his Walter Investment stock for significant proceeds. Defendant Dixon's insider sales during the Class Period was grossly disproportionate to his insider sales during the Comparison Period because Dixon sold no Walter Investment stock during the Comparison Period. Of Defendant Dixon's proceeds, approximately $2 million was profit. Further, Defendant Dixon's insider sales were suspicious in timing. In late January 2013, Defendant Dixon unloaded $2.3 million worth of stock over the course of only two days. Not long after, in March 2013, the Company disclosed its internal control failures. Thus, Defendant Dixon, who had served on the Company's Audit Committee, and whose Company shares vested well prior to January 2013, sold a huge amount of his stock shortly prior to the disclosure of damaging news. Both the timing and amount of Defendant Dixon's stock sales are suspicious and indicate that he improperly benefitted from insider information. (Compl. ¶¶ 162–63.)
- Suspicious Stock Trading: Defendant Dixon's insider sales during the Class Period substantially augmented his base salary. Defendant Dixon's base salary was $428,000 for 2013 and his Class Period stock sales generated

proceeds of five and half times his annual salary. (Compl. ¶ 164.)

- Bonus: In 2013, Defendant Dixon received $475,000 and in 2013, he received $492,500. This compensation "took into account the successful integration of the Green Tree business, the significant financial initiatives that were undertaken in 2012, the opportunistic expansion of the Company's business (both in size and product portfolio) and the continued strong regulatory compliance of the business." Therefore, Defendant Dixon was also motivated to misrepresent the state of Company's legal and regulatory compliance. (Compl. ¶ 165.)

*v. Defendant Cauthen*

In support of a finding that Defendant Cauthen acted with scienter, Plaintiffs allege the following:

- Knowledge & Access: Defendant Cauthen, as the Chief Operating Officer and Chief Financial Officer of Walter Investment, was a "hands-on" manager, responsible for overseeing all aspects of Walter Investment's business, including regulatory and compliance matters. Defendant Cauthen received daily reports and had access to computerized information regarding servicing requirements, disclosures, processes and errors, internal controls, financial results and the valuation of acquisitions. Defendant Cauthen also was involved in deciding which disclosures would be made by the Company and signed Walter Investment's filings with the SEC during the Class Period, including certificates filed pursuant to SOX stating the financial reports were accurate and complied with GAAP. (Compl. ¶ 167.)

- Knowledge: On a conference call on November 8, 2012, Defendant Cauthen spoke knowledgeably about Walter Investment's efforts to acquire new loans and costs that would be incurred to service non-performing loans. These costs are strongly associated with Walter Investment's regulatory and compliance efforts, and indicate Defendant Cauthen's familiarity with these issues. Defendant Cauthen also spoke about the need to drive delinquencies down to lower costs, demonstrating his knowledge of the costs associated with failing to properly address delinquencies. And Defendant Cauthen paid special attention to the servicing side of Walter Investment's business, emphasizing in a conference call dated May 9, 2013 how well the servicing business was doing. (Compl. ¶ 168.)

- Red Flags: Given Defendant Cauthen's position with the Company, and his demonstrated hands-on involvement in the Company's day-to-day affairs and compliance, a strong inference arises that he was aware of the widespread consumer complaints and lawsuits alleged herein, Green Tree's failure to meet over 30% of basic compliance metrics as evidenced by the report of the Office of Mortgage Oversight, the numerous government investigations during the Class Period, and the abusive consumer practices that the FTC and CFPB now seek to enjoin. Despite Defendant Cauthen's knowledge of the material adverse facts concerning the servicing violations and other legal violations that plagued the Company, he continued to make positive statements concerning its regulatory compliance. (Compl. ¶ 169.)

- Suspicious Stock Trading: Defendant Cauthen had a strong personal motivation to keep Walter Investment's stock price inflated, even if that meant misrepresenting the state of the Company's internal controls and compliance with state and federal regulations. During the Class Period, Defendant Cauthen sold over $2.8 million of his Walter Investment stock. (Compl. ¶ 170.)

- Suspicious Stock Trading: Defendant Cauthen's Class Period insider selling substantially augmented his base salary for 2013. Defendant Cauthen's base salary for 2013 was $430,000 and his insider sales amounted to more than six and a half times his base salary for 2013. Further, Defendant Cauthen's trading profits exceeded $2.4 million. (Compl. ¶ 171.)

- Bonus: Defendant Cauthen also was motivated to misrepresent the Company's legal and regulatory compliance to receive a significant annual bonus. In 2013, he received $468,700 and in 2012, he received $492,987. This compensation "took into account the successful integration of the Green Tree business, the significant financial initiatives that were undertaken in 2012, the opportunistic expansion of the Company's business (both in size and product portfolio) and the continued strong regulatory compliance of the business." (Compl. ¶ 172.)

- Resignation: Further probative of scienter is the suspicious timing of Defendant Cauthen's resignation, which was announced on October 3, 2013, mere days after the Company was forced to issue new financial statements for RMS and only weeks before disclosing that the CFPB was considering taking action against Green Tree for violating the consumer protection laws. (Compl. ¶ 174.)

### 3. Analysis of Scienter Allegations

The Court begins by noting that the allegations in the Second Amended Com-

plaint are not based on direct evidence showing that the Walter Individual Defendants acted with scienter. Plaintiffs have not cited to any documents that were authored by any of the Walter Individual Defendants as proof that they knew of the alleged fraud and, with the exception of Defendant Anderson, none of the human sources state that they discussed the alleged fraud with the Walter Individual Defendants. This, however, is not fatal to Plaintiffs' Section 10(b) and Rule 10b–5 claims because circumstantial proof will suffice. The Court must now address whether a reasonable person would infer, based on the circumstances alleged in the Second Amended Complaint, that there was at least a fifty-fifty chance that each of the Walter Individual Defendants knew about the alleged fraud or was severely reckless in not knowing.

### a. Knowledge or Access to Facts Contradicting Public Statements

■ Plaintiffs allege and argue that the Walter Individual Defendants acted with scienter because they knew and had access to the true facts concerning the Company's legal compliance issues and internal control deficiencies. However, with respect to Defendants O'Brien, Dixon and Cauthen, the Court does not find that these allegations support an inference that they acted with scienter.

■ As the Court found above, when scienter allegations are based on an executive's knowledge and access to material that contradicts the company's or his/her public statements, there must be particularized allegations that the executive knew or was severely reckless in disregarding the true facts. *Brophy*, 781 F.3d at 1304–05. As alleged, the allegations regarding knowledge or access to facts contradicting public statements omit the necessary details of what specific information was received by Defendants O'Brien, Dixon and

Cauthen, what they ignored or were severely reckless in disregarding (e.g., documents, emails, recommendations from others, etc.), and a connection between their actions and the facilitation of fraud. It is simply not enough to allege in a conclusory fashion that these Defendants knew of the true facts because they had access to certain materials due to their positions in the Company. Instead, there must be particularized allegations from which the Court can infer a strong inference of scienter.

For example, in *In re Friedman's Inc. Sec. Litig.*, the court found that scienter was properly pled where the company's controller was alleged to have personally reviewed reports that disclosed the accounting errors. 385 F.Supp.2d 1345, 1363 (N.D.Ga.2005.) And as the Eleventh Circuit noted in *Brophy*, courts have found particularized allegations exist when a plaintiff alleges that there were "focused inquiries from analysts that correctly suggested why the projections were implausible" or the defendant "personally reviewed erroneous loan valuations, communicated often with other executives and subordinates, and gave 'reassurances' to investors regarding key issues in the case." 781 F.3d at 1304–05. Here, Plaintiffs have not alleged with any particularity the contents of what Defendants O'Brien, Dixon and Cauthen had access to and therefore, the Court does not find that the allegations that they knew and had access to the true facts concerning the Company's legal compliance issues and internal control deficiencies support a strong inference of scienter.

■ In contrast to Defendants O'Brien, Dixon and Cauthen, there are particularized allegations to support an inference that Defendants Corey and Anderson acted with scienter. With respect to Defendant Corey, the Court finds that he was in a unique position to know of the regulatory compliance issues and inter-

nal control deficiencies. During the Class Period, Defendant Corey was in charge of the Company's legal compliance department, assessed risk to the Company from a customer perspective and a regulatory perspective, held himself out to be knowledgeable regarding regulatory issues, and held monthly meetings with senior management to review law changes and implement the necessary changes in order for the Company to be compliant. (Compl. ¶ 188.) Additionally, prior to the start of the Class Period, in September 2011, Defendant Corey certified in a court filing that he had personal knowledge and was fully familiar with Green Tree's operations relating to foreclosure processing. (Compl. ¶ 189.) And in 2009 and 2011, prior to the start of the Class Period, Defendant Corey commented on consumer complaints and litigation relating to Green Tree's servicing practices from which he would have known of problems with Green Tree's compliance and internal controls. *Id.* Furthermore, while Defendant Corey's position at Green Tree is not dispositive, presumably, as Green Tree's General Counsel, he would have been the individual responsible for responding to the FTC's Civil Investigation Demand in 2010 and its Supplementary Discovery Request in 2011. Accepting the allegations in the Second Amended Complaint as true, the Court finds that the allegations that Defendant Corey knew and had access to materials contradicting the Company's public statements weigh in favor of a finding that Defendant Corey acted with scienter.

Defendant Corey argues that the 2009 and 2011 allegations cannot support a finding of scienter because they are insufficient to show that the statements made during the Class period were false. Although the Court agrees that standing alone these allegations are insufficient because they occurred prior to May 9, 2012, the start of the Class Period, the Court does not find that this automatically renders the allegations irrelevant. This is so because Plaintiffs have shown that the events that occurred outside of the Class Period are similar to the events that occurred during the Class Period, which plausibly suggest a long standing course of misconduct extending into the Class Period. *Sharenow v. Impac Mortg. Holdings, Inc.,* 385 Fed.Appx. 714, 716–17 (9th Cir. 2010) (finding that the plaintiff failed to adequately allege scienter because it could not "tie [ ] violations [that occurred outside the class period] to the class period with the great detail required to give rise to a strong inference of scienter") (internal quotation marks and citation omitted). For example, two consumer complaints that took place in June 2014 describe harassing calls from Green Tree employees, which are similar to the complaint from 2009. Therefore, the Court finds that the allegations of events that took place outside of the Class Period are relevant but not a decisive factor in the scienter analysis. *See also In re Merck & Co., Inc. Sec. Litig.,* 432 F.3d 261, 271–72 (3d Cir.2005) (relying on two Second Circuit cases to hold that allegations of events occurring outside of the class period are relevant to show defendant's statements to be misleading); *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir.2001) (finding that pre-class data could be used to "confirm what a defendant should have known during the class period").

The Court also finds that the knowledge and access allegations in the Second Amended Complaint weigh in favor of a finding that Defendant Anderson acted with scienter. Of significance, are the allegations that three individuals separately contacted Defendant Anderson to complain about Green Tree's deceptive foreclosure practices, its failure to comply with home loan modification procedures and its numerous servicing errors on a mortgage

account. (Compl. ¶ 59.) Like Defendant Corey, Defendant Anderson argues that two of the three consumer complaints cannot support a strong inference of scienter because they occurred outside of the Class Period. The Court finds that the consumer complaints that were made prior to the Class Period took place 3 months or less before the start of the Class Period and are very similar to the other complaints that were made during the Class Period, suggesting a course of conduct extending into the Class Period. Therefore, the two consumer complaints that fall outside of the Class Period are not dispositive, but are relevant in analyzing whether Defendant Anderson had the requisite scienter.

The third consumer that contacted Defendant Anderson during the Class Period stated that his e-mail generated a response. Defendant Anderson further argues that this complaint cannot support an inference of scienter because Plaintiffs have not alleged who responded or what was said in the response. The allegation that Defendant Anderson knew about Green Tree's compliance issues would be stronger had Plaintiffs included the response; however, at this stage in the litigation the Court accepts all the allegations contained in the Second Amended Complaint as true and therefore, the Court finds that all three complaints weigh in favor of a finding that Defendant Anderson acted with scienter.

*b. Red Flags*

█ Plaintiffs allege that the Walter Individual Defendants knew of or recklessly disregarded red flags. Plaintiffs cite to (i) internet postings by current and former Green Tree employees showing that Green Tree fostered coercive and illegal collection practices; (ii) lawsuits filed by individuals complaining about Green Tree's abusive collection practices; (iii) consumer complaints against Green Tree regarding its abusive collection practices, improper loan modifications, and improper foreclosure practices; (iv) a petition calling for the cessation of Green Tree's inaccurate billing and reporting of customer payments as well as aggressive accounting tactics; (v) the government investigations focused on violations of consumer financial laws; (vi) a report issued by the OMSO finding that Green Tree failed 8 out of the 28 compliance metrics relating to its servicing of the loan portfolio; and (vii) Fitch Ratings placing Green Tree on a negative watch. (Compl. ¶¶ 50–61, 65 & 66.)

One government investigation resulted in an enforcement action and on April 21, 2015, District Judge Susan Richard Nelson entered a Stipulated Order for Permanent Injunction and Monetary Judgment (the "Consent Order"), which resolved the enforcement action brought by the Federal Trade Commission and the Consumer Financial Protection Bureau against Green Tree. D.E. 90–5. The complaint in the enforcement action alleged claims under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a); Sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531(a) and 5536(a)(1); the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x; and Section 6 of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605, and its implementing regulation, Regulation X, 12 C.F.R. part 1024 (formerly codified at 24 C.F.R. part 3500) (collectively "RESPA"). *Id.* at 3. Although Green Tree neither admitted nor denied the allegations in the enforcement action complaint, the Consent Order enjoined Green Tree from engaging in the practices described in the consumer complaints, lawsuits, internet postings by current and former Green Tree employees and the OMSO report. *Id.* at 13–19 & 28.

Government investigations can contribute to an inference of scienter but as state of mind is the key issue in analyzing scienter, unless the investigation reveals each defendant's state of mind for the alleged fraud, the effect of the investigation on the scienter analysis is limited. *In re ITT Educ. Servs., Sec. Litig.*, 34 F.Supp.3d 298, 309 (S.D.N.Y.2014). Here, neither the complaint in the enforcement action nor the Consent Order include facts that show each of the Walter Individual Defendants acted with scienter. In fact, neither document mentions the Walter Individual Defendants. As a result, "the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter," but will not, standing alone, support an inference of scienter. *Washtenaw Cnty. Emp. Ret. Sys. v. Avid Tech., Inc.*, 28 F.Supp.3d 93, 114–15 (D.Mass. 2014).

There are no allegations showing that Defendants O'Brien, Dixon and Cauthen knew of the internet postings, consumer complaints, lawsuits, or the petition. *See Mizzaro*, 544 F.3d at 1253 (holding that the plaintiffs failed to allege scienter because, in part, the "amended complaint affords no basis for inferring that the individual defendants would have heard about these whistleblower complaints during the class period"). Furthermore, the presence of government investigations, the report issued by the OMSO and Fitch Ratings's negative watch would have alerted Defendants that the fraud alleged in the Second Amended Complaint had occurred but, without more, do not establish a strong inference of scienter, which requires particularized allegations about each defendant's state of mind in making the misstatements. Therefore, the Court concludes that red flags are insufficient to support an inference that Defendants O'Brien, Dixon and Cauthen acted with scienter.

■ On the other hand, however, Defendant Anderson, the former CEO of Green Tree, and Defendant Corey, Green Tree's former General Counsel, knew that Green Tree was under investigation for aggressive and illegal collection practices, knew that consumers were complaining about Green Tree's aggressive and fraudulent collection practices and knew that current and former Green Tree employees confirmed such practices. Accepting these allegations as true, the Court finds that these allegations further support an inference that Defendants Anderson and Corey acted with scienter.

*c. Core Operations*

Plaintiffs allege that Green Tree was a core operation of Walter Investment and that knowledge of its compliance issues can be imputed to the Walter Individual Defendants. To support this allegation, Plaintiffs further allege that Green Tree was a core operation of Walter Investment because it "constituted a substantial source of revenue," Walter Investment projected that Green Tree's acquisition "would bring EBITDA from $46.9 million to a combined $233.6 million," and that the "Green Tree business is significantly larger than the Company's business." (Compl. ¶¶ 141–42.) Plaintiffs have alleged sufficient facts to show that Green Tree was a core operation of Walter Investment and coupled with the allegations that Defendants Corey and Anderson had knowledge of illegal practices, the Court finds that knowledge of Green Tree's compliance issues may be imputed to Defendants Anderson and Corey.

Conversely, the Court finds that merely alleging that Green Tree is a core operation does not lead to a conclusion that Defendants O'Brien, Dixon and Cauthen acted with scienter because the PSLRA requires more. *In re NDCHealth Corp.*,

*Inc. Sec. Litig.*, 2005 WL 6074918, at \*8 n. 10 (N.D.Ga. July 27, 2005) (relying on the PSLRA to reject argument that facts critical to a business's core operation are generally so obvious that their knowledge may be attributed to key officers).

### d. Bonuses & Other Motives

 Plaintiffs allege that the Walter Individual Defendants were motivated to keep Walter Investment's stock price inflated because of bonus compensation plans, in order to comply with, and to facilitate debt and revolving loan agreements, the issuance of new stock options, and the Company's acquisition of companies. *See, e.g.*, Compl. ¶¶ 148–50 & 172. These allegations are insufficient to establish scienter because they are broad and conclusory, and thus do not support a strong inference that the Walter Individual Defendants acted with scienter. *See Meyer v. St. Joe Co.*, 2012 WL 94584, at \*11 (N.D.Fla. Jan. 12, 2012) (finding that plaintiff's arguments regarding defendants' motives are unpersuasive because "[h]igher compensation packages, debt covenants and approaching stock offerings are common factors affecting many companies"); *Edward J. Goodman Life Income Trust*, 595 F.Supp.2d at 1275 (finding that bonus allegations yield no inference of scienter because plaintiff failed to allege facts demonstrating that any defendant received or had the potential to receive an extraordinary bonus).

### e. Resignations

 As discussed above, resignations can strengthen an inference of scienter when they occur around the same time as an investigation. *Brophy*, 781 F.3d at 1305 (citation omitted). Plaintiffs allege that Defendant Cauthen's resignation supports an inference of scienter because he resigned days after the Company issued new financial statements for RMS and only weeks before disclosing that the CFPB was considering taking action against Green Tree for violating consumer protection laws. Additionally, Plaintiffs allege that Defendant Anderson's resignation supports an inference of scienter because he resigned days before the Company's disclosed that the government was seeking injunctive relief against and fines from Green Tree. The Court disagrees.

In its Form 10–Q filed on November 6, 2013, the Company stated that the FTC had issued a Civil Investigative Demand in November 2010 and the CFPB had issued a Civil Investigative Demand in September 2012 regarding Green Tree. (Compl. ¶ 118.) According to the Second Amended Complaint, Defendant Cauthen resigned on October 3, 2013 and Defendant Anderson resigned on August 8, 2014. (Compl. ¶¶ 174 & 178.) Defendant Anderson's and Defendant Cauthen's resignations did not occur around the same time as the investigations and therefore, the Court cannot infer from their resignations that they acted with scienter. Furthermore, the Court has already found that Defendant Cauthen is not the maker of the statements contained in RMS's financial statements and therefore, the fact that his resignation occurred around the same time as the restatement of RMS's financial statements is of no consequence.

### f. Suspicious Trading

 The timing of stock trades by insiders may be relevant to inferring scienter, *Mizzaro*, 544 F.3d at 1253, because, "when coupled with other evidence, [it] may be probative of scienter if the sales were done in suspicious amounts or at suspicious times." *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F.Supp.2d 1267, 1287 (S.D.Fla.2008). "In determining whether stock sales are unusual or suspicious, a court may look to: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency

between the sales and the insider's prior trading history." *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d 1291, 1303 (S.D.Fla.2002) (citation omitted). However, the "complaint must allege some information about the insider's trading history for [the Court] to determine whether 'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Edward J. Goodman Life Income Trust*, 594 F.3d at 793 (citing *Mizzaro*, 544 F.3d at 1253).

 Plaintiffs allege that, during the Class Period, the Walter Individual Defendants sold Walter Investment's stock at an inflated price and made a substantial profit from the sales. In response, the Walter Individual Defendants argue that certain or all of their sales were made pursuant to a Rule 10b51 plan to satisfy tax obligations. However, the "existence of a Rule 10b5–1 Trading Plan is an affirmative defense that must be pled and proved." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F.Supp.2d 171, 200 (S.D.N.Y. 2010). And trading conducted through a Rule 10b5–1 plan is not automatically immunized because "a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b51 plan." *Id.; In re Immucor Inc. Sec. Litig.*, No. 1:05–CV–2276–WSD, 2006 WL 3000133, at *18 n. 8 (N.D.Ga. Oct. 4, 2006). Furthermore, "trading plans are not a cognizable defense to scienter allegations on a motion to dismiss where . . . they were adopted during the class period." *Freudenberg*, 712 F.Supp.2d at 201 (citing *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 554 (5th Cir.2007)). Here, Plaintiffs allege that the Walter Individual Defendants adopted the plans during the Class Period, Compl. ¶ 155 n. 5, and the Walter Individual Defendants have

not argued otherwise. Therefore, the Court finds that at this stage in the litigation the Walter Individual Defendants' use of a 10b5–1 plan does not rebut a finding of scienter.

 However, the Court finds that Defendant O'Brien's and Defendant Cauthen's stock sales do not support a finding of scienter because Plaintiffs have not alleged that their stocks sales were suspicious in timing and Plaintiffs have not included their trading history in the Second Amended Complaint for comparison. Because Plaintiffs have failed to plead any information about Defendant O'Brien's and Defendant Cauthen's trading history before the Class Period, the Court is unable to determine from the Second Amended Complaint whether their sales of shares are suspicious enough to suggest scienter. *See Edward J. Goodman Life Income Trust*, 594 F.3d at 793.

With respect to Defendant Dixon, Plaintiffs allege that he sold no stock during the comparison period but sold $2,359,831 worth of stock during the Class Period and the sale was suspicious in timing because it occurred 2 months prior to Walter Investment's disclosure about internal control failures. (Compl. ¶ 163.) Defendant Dixon argues that his stock sales are not evidence of scienter because (i) he acquired nearly 25,000 shares during the Class Period, which negates any inference of fraudulent intent, (ii) no meaningful inference can be drawn from the fact that he made no sales during the comparison period and his sales during the Class Period occurred on 2 consecutive days, and (iii) over the two-day period he sold only 18.7% of his holdings. D.E. 77 at 22 & 23. The Court finds that the timing of Defendant Dixon's sales and the fact that he sold stock during the Class Period but sold no stock during the 824 day comparison period weigh in favor of an inference of scienter. However, Defendant Dixon's pur-

chase of stock during the Class Period, which includes a purchase approximately 5 months after Walter Investment's March 2013 disclosure of its internal control failures, cuts against an inference of scienter.[13] In sum, Defendant Dixon's stock trades might, together with other evidence, support an inference of scienter, but the Court cannot find that Defendant Dixon acted with scienter based solely on the transactions listed in the Second Amended Complaint.

Lastly, with respect to Defendants Anderson and Corey, Plaintiffs do not allege that their stock trades occurred at suspicious times but they do allege that Defendants Anderson and Corey sold substantial amounts of stock during the Class Period and purchased no stock during the comparison period. Furthermore, Plaintiffs allege that a full comparison period of 824 days is not available for either Defendants Anderson or Corey because they did not become insiders at Walter Investment until the purchase of Green Tree on July 1, 2011. As a result, the comparison period consists of 313 days from the date of Green Tree's acquisition until May 8, 2012, the day before the start of the Class Period. Given the limited comparison period, the Court cannot assess whether Defendant Anderson's and Defendant Corey's sales during the Class Period are meaningfully out of line with prior trading practices. As a result, the Court finds that Defendant Anderson's and Defendant Corey's stock trades neither weigh in favor or against a finding of scienter.

### g. Confidential Witness

■ The Eleventh Circuit has held that reliance on confidential witnesses is permissible only "so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." *Mizzaro*, 544 F.3d at 1239. In their Second Amended Complaint, Plaintiffs allege that CW1 worked in loss mitigation at EverBank from May 2013 until May 2014 and that EverBank was acquired by Green Tree in May 2014. After the acquisition, CW1 worked for Green Tree for one month and it is unclear what position he held at Green Tree or what department he continued to work in. Because Plaintiffs have failed to plead sufficient facts to demonstrate the basis of CW1's statements (e.g. job title and job duties while employed by Green Tree), the Court finds that CW1's statements do not contribute to supporting an inference of scienter. Furthermore, it is unclear whether the abusive tactics that CW1 witnessed took place during the month in which Green Tree acquired EverBank or prior to Green Tree's acquisition. Finally, the Second Amended Complaint is devoid of any allegations showing that CW1 communicated any of his/her complaints with the Walter Individual Defendants or how they were otherwise aware of his/her complaints.

### h. Sarbanes–Oxley Certifications

■ Plaintiffs further rely on the fact that Defendants O'Brien and Cauthen signed Sarbanes–Oxley certifications stating that Walter Investment's financial reports were accurate and complied with GAAP to prove scienter. This allegation, however, is insufficient to support a strong inference of scienter. In *Mizzaro*, the Eleventh Circuit summarized when such certifications are relevant to the scienter inquiry:

---

13. The Court takes judicial notice of Defendant Dixon's Form 4 filed on August 14, 2013. D.E. 77–1 at 240; *Mogensen v. Body Cent. Corp.*, No. 3:12–cv–954–J–20JRK, 2013 WL 8290493, at *5 (M.D.Fla. Sep. 19, 2013) (finding that courts routinely take judicial notice of Forms 4 when ruling on a motion to dismiss when the plaintiff has put the defendant's trading history at issue).

In *Garfield*, we held that "a Sarbanes—Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." 466 F.3d at 1266. A certifier would be severely reckless, *Garfield* held, only if he "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions." Because no such glaring "accounting irregularities" or "red flags" are present here, the Sarbanes—Oxley certifications by the individual defendants do not support an inference of scienter.

544 F.3d at 1252 (internal punctuation omitted).

Plaintiffs failed to allege sufficient facts to show that Defendants O'Brien and Cauthen had knowledge of the alleged fraud or red flags, which would have alerted them to the material misstatements contained in the financial statements. Therefore, the Court finds that the Sarbanes—Oxley certifications do not support an inference that Defendants O'Brien and Cauthen acted with scienter.

#### i. *Summary*

Viewing Plaintiffs' allegations in the aggregate, for the reasons stated above, the facts set forth in the Second Amended Complaint do not create a strong inference that Defendants O'Brien, Cauthen and Dixon acted with scienter. But, the allegations in the aggregate permit a strong inference that Defendants Anderson and Corey acted with scienter.

#### C. *Walter Investment & Corporate Scienter*

Because the Court has found that Plaintiffs adequately alleged scienter for Defendants Anderson and Corey, Plaintiffs have also adequately plead scienter against Walter Investment. *See Druskin*, 299 F.Supp.2d at 1322 (finding that the scienter of a corporation's officer may be imputed to the corporation under general agency and corporate law principles).

### III. *Loss Causation*

To state a claim of securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must prove "a causal connection between the misrepresentation and the investment's subsequent decline in value." *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir.2013) (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997) (internal quotation marks omitted)). In a fraud-on-the-market case, such as the one presented here, "the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff." *Id.* (quoting *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir.2012) (internal quotation marks omitted)). Furthermore, "loss causation does not require proof that the fraudulent misrepresentation was the *sole* cause of a security's loss in value, but the plaintiff must still demonstrate that the fraudulent statement was a 'substantial' or 'significant' cause of the decline in price." *Id.* at 1196 (citation omitted).

Because this is a fraud-on-the-market case, Plaintiffs may demonstrate loss causation by:

(1) identifying a corrective disclosure (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the

company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a substantial amount of the price drop.

*Id.* (internal quotation marks and citation omitted).

In the December 23, 2014 Order, the Court found that Plaintiffs demonstrated loss causation. Specifically, the Court found that the disclosure made in March 2013, *see* Compl. ¶¶ 113–114, was the only corrective disclosure alleged by Plaintiffs with a corresponding stock price drop and that the other alleged disclosures were not corrective. D.E. 71 at 37–40. The Court's prior finding with respect to the disclosure made in March 2013 remains unchanged and therefore, the Court will not address that disclosure in this opinion. However, in their Second Amended Complaint, Plaintiffs have also included the same disclosures rejected by the Court and for the reasons stated in the Court's previous Order, the disclosures alleged in paragraphs 115 through 122, cannot support a finding of loss causation.

 In addition to the disclosures discussed above, Plaintiffs have included the following allegations to support a finding of loss causation:

- On August 8, 2014, Defendant Anderson resigned. (Compl. ¶ 123.)
- On August 11, 2014, the Company disclosed in a Form 10–Q filing that it is pursuing settlement discussions with the government agencies concerning Green Tree. (Compl. ¶ 124.) In that Form 10–Q, the Company disclosed

that: (i) it had been informed by the FTC and CFPB staffs that "as part of a settlement, they will seek injunctive relief in relation to Green Tree Servicing business practices, civil money penalties and equitable monetary relief;" (ii) "the CFPB staff has authority to commence an action against Green Tree Servicing and that the FTC staff has authority to negotiate and would need further FTC approval to file such an action;" and (iii) with respect to the RMS investigation, the Department of Justice had begun investigating possible violations of the False Claims Act. *Id.* Plaintiffs allege that as a result of this disclosure, on August 11, 2014, Walter securities opened at $28 and closed at $24.75, a drop of more than 11%. (Compl. ¶ 126.)

- The day after the August 11, 2014 disclosure, on August 12, 2014, Compass Point Research and Trading LLC issued a report regarding the Company, which noted that the Company's recent stock price decline was caused in part by the Company's August 11, 2014 disclosure concerning the developments with regulators. (Compl. ¶ 127.) Also, on August 12, 2014, analyst FBR Capital downgraded Walter from "Outperform" to "Market Perform" given the rising legal and regulatory costs. (Compl. ¶ 128.)

- Finally, on November 6, 2014, the Company filed with the SEC on Form 10–Q its quarterly report for the period ending September 30, 2014, which disclosed that Green Tree was now under investigation by various state attorneys general and state regulators as well as the Office of the United States Trustee concerning its business practices, including its loan servicing practices. (Compl. ¶ 129.) [14]

**14.** The Court need not address the November 6, 2014 disclosure as it occurred outside the

Class Period or any other disclosure that oc-

Plaintiffs have not alleged that Defendant Anderson's resignation revealed to the market a pertinent truth or that there was a subsequent drop in stock price after the announcement of his resignation. Therefore, without an allegation that Defendant Anderson's resignation somehow caused the Plaintiffs to suffer losses, his resignation does not support loss causation. *Meyer*, 710 F.3d at 1197 (finding that the loss causation analysis asks the question "did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?").

Defendants argue that the August 11, 2014 disclosure is not a corrective disclosure because the information was previously disclosed to the market and even if the information had not been previously disclosed, the disclosure is related to an investigation and the Court has found that without a finding of fraud an investigation is not a corrective disclosure. The Court agrees in part. First, the Court agrees that the announcement that the DOJ will be investing RMS does not amount to a corrective disclosure. *Meyer*, 710 F.3d at 1201 n. 13 (finding that an investigation can qualify as a corrective disclosure if it is "coupled with a later finding of fraud or wrongdoing"). Next, the Court agrees that Walter Investment previously disclosed in its May 8, 2014 10–Q that "the CFPB staff has authority to commence an action against Greet Tree Servicing and that the FTC staff has authority to negotiate and would need further FTC approval to file such an action." *See* D.E. 77–1 at 4.

Therefore, these disclosures cannot support a finding of loss causation.

However, the Court further finds that Walter Investment's prior disclosures did not reveal that the FTC and CFPB were in fact seeking injunctive relief, civil penalties and equitable monetary relief. Instead, the prior disclosures revealed that this outcome was a possibility. Since the filing of the Second Amended Complaint, the FTC and CFPB have filed an enforcement action against Green Tree, which was disposed of through a Consent Order requiring injunctive relief, civil penalties and monetary relief. Although Green Tree neither admitted or denied the allegations contained in the complaint filed in the enforcement action and none of the Defendants in this action were named in that complaint, the wrongdoing alleged in the enforcement action relates in large part to the wrongdoing alleged here. And the analysts' reports issued on August 12, 2014 strengthen the inference that the disclosure revealed a truth to the market. Therefore, the Court finds that the August 11, 2014 disclosure relating to the outcome of the FTC and CFPB investigation coupled with the analysts' reports amount to a corrective disclosure and supports a finding of loss causation. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir.2013) (finding that "a defendant's failure to admit to making a misrepresentation, or his denial that a misrepresentation was made, does not necessarily preclude loss causation" and that the "the appropriate inquiry" is whether the disclo-

---

curred outside the Class Period. *See Masters v. GlaxoSmithKline*, 271 Fed.Appx. 46, 51 (2d Cir.2008) (finding that plaintiff failed to allege loss causation because the stock drop occurred after the close of the class period); *In re OSG Sec. Litig.*, No. 12 Civ. 7948(SAS), 2015 WL 3466094, at *2 n. 14 (S.D.N.Y. May 29, 2015) ("[D]isclosures made after the close of the class period cannot be 'corrective' for

the purpose of establishing loss causation."). However, even if the Court were to consider the November 6, 2014 disclosure, it would find that the disclosure does not support loss causation because the Plaintiffs failed to allege that there was a subsequent drop in the price of Walter Investment's stock after the November 6, 2014 disclosure.

sure revealed to the market that there were problems).

*IV. Section 20(a)*

In addition to their claim under Section 10(b) and Rule 10b–5, Plaintiff also alleges a claim against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). This Section provides for joint and several liability of any person who had the "power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996). The plaintiff carries the burden of showing that a defendant is a controlling person and a plaintiff cannot adequately plead violations of Section 20(a) without adequately pleading the primary violations. *Id.* at 396–97; *Druskin*, 299 F.Supp.2d at 1339 (citing *Malin v. Ivax Corp.*, 17 F.Supp.2d. 1345, 1351 (S.D.Fla.1998)).

Because Plaintiffs have failed to adequately plead a violation of Section 10(b) and Rule 10b–5 for Defendants Helm, O'Brien, Cauthen and Dixon, their claim under Section 20(a) against those Defendants fails. However, the Court finds that Plaintiffs have adequately alleged a claim under Section 20(a) against Defendants Anderson and Corey.

### CONCLUSION

In accordance with the foregoing, it is hereby

ORDERED AND ADJUDGED that Defendant Helm's Motion to Dismiss, D.E. 76, is GRANTED. It is further

ORDERED AND ADJUDGED that Defendants Walter Investment Management, Corporation, Mark J. O'Brien, Denmar Dixon, Keith A. Anderson, Brian Corey and Charles E. Cauthen's Motion to Dismiss, D.E. 77, is GRANTED IN PART AND DENIED IN PART. It is further

ORDERED AND ADJUDGED that Defendants Mark J. O'Brien, Denmar Dixon, Charles E. Cauthen and H. Marc Helm are DISMISSED from this action. It is further

ORDERED AND ADJUDGED that Plaintiffs must file a Third Amended Complaint on or before July 10, 2015 in order to incorporate the documents that the Court took judicial notice of on April 11, 2015 and April 27, 2015. Plaintiffs are not permitted to amend the Second Amended Complaint to include any further allegations and must submit to the Court a redline comparing the Second Amended Complaint with the Third Amended Complaint at the time of the filing of the Third Amended Complaint. It is further

ORDERED AND ADJUDGED that Defendants Walter Investment Management, Corporation, Keith A. Anderson and Brian Corey must file their answer on or before July 24, 2015. No further motions to dismiss will be allowed.